**Matthew WOODS, Deceased, by and through His Guardian ad Litem, T. Bruce Simpson, Jr., Appellant,**

v.

**COMMONWEALTH OF KENTUCKY, Cabinet for Human Resources (Now Cabinet for Families and Children), Appellee.**

No. 1999–SC–0773–DG.

Supreme Court of Kentucky.

Aug. 26, 2004.

T. Bruce Simpson, Jr., Anggelis, Gordon, Simpson & Roberts, Lexington, Counsel for Appellant.

G. Thomas Mercer, Office of the Counsel, Cabinet for Families and Children, Sherri D. Pate, Cabinet for Human Resources, General Counsel, Frankfort, Counsel for Appellee.

Richard N. Bush, George S. Schuhmann, Louisville, Counsel for Amicus Curiae Council for Retarded Citizens, Inc.

Robert C. Cetrulo, Northern Kentucky Right to Life, Covington, Edward L. White, III, Thomas More Center for Law & Justice, Ann Arbor, MI, Counsel for Amicus Curiae Thomas More Center for Law & Justice.

Melissa J. Bowman, Kenneth W. Zeller, Protection and Advocacy, Frankfort, Counsel for Amicus Curiae Protection and Advocacy Division of the Kentucky Department of Public Advocacy.

Francis J. Manion, American Center for Law and Justice—Midwest, New Hope, Counsel for Amicus Curiae Catholics United for Life.

COOPER, Justice.

This appeal challenges the constitutionality of KRS 311.631, a provision of the Kentucky Living Will Directive Act, insofar as it permits a judicially-appointed guardian or other designated surrogate to authorize the withholding or withdrawal of artificial life-prolonging treatment from a ward or patient who is either in a persistent vegetative state or permanently unconscious. If the statute is constitutional, the issue becomes how to implement it.

Matthew Woods was born on November 24, 1941; he died during the course of these proceedings on June 2, 1996. His intelligence quotient (I.Q.) was between 70 and 71 and, by judicial appointment, various state agencies had managed his affairs since May 12, 1970. On January 28, 1991, pursuant to a jury's verdict that he was partially disabled, KRS 387.570; KRS 387.580, the Fayette District Court appointed an agent of the Cabinet for Human Resources ("CHR") as Woods's limited guardian with authority to make certain decisions for him, including consent to medical procedures. Woods lived in a state-approved group home, attended church, had a girlfriend, participated regularly in day-treatment programs, and was able to travel across town by bus to visit friends. He was treated for asthma by doctors at the University of Kentucky Medical Center.

On April 18, 1995, Woods suffered cardiopulmonary arrest while being transported by a friend to the Medical Center for treatment of a severe asthma attack. His friend detoured to the nearest hospital, St. Joseph Hospital, where medical

personnel resuscitated Woods and connected him to a mechanical ventilator. Efforts to further revive him failed and he never regained consciousness. An electroencephalogram· (EEG) examination revealed severe global encephalopathy, which his doctors agreed was caused by hypoxia, *i.e.*, oxygen deprivation that occurred between the cardiopulmonary arrest and the resuscitation. His treating physician, Dr. Jeremiah Suhl, and a consulting neurologist, Dr. William C. Robertson, agreed that Woods had suffered total and irreversible cessation of all normal brain functions. He responded to neither voice nor pain stimuli. He was unable to breathe or swallow. A tracheostomy was performed to permanently attach a mechanical ventilator that pumped oxygen into his lungs. At first, nutrition and hydration were provided through nasal feeding tubes. Later, a gastrostomy was performed so that nutrition and hydration could be mechanically pumped directly into his small intestines. Nevertheless, Woods was not dead as defined in KRS 446.400 because short bursts of electrical activity still emanated from his brain stem. These impulses caused severe myoclonus, a condition manifested by violent muscle spasms that were controlled only by a paralyzing drug. According to Dr. Robertson, there is no recorded case of a patient with myoclonus regaining consciousness absent some improvement within the first twenty-four to forty-eight hours. Woods's condition did not improve. He remained in a state of permanent unconsciousness,[1] a condition more severe than a persistent vegetative state,[2] in *mors interruptus*, suspended by "merger of body and machine"[3] in a Limbo somewhere between cognizant life and legal death.[4]

1. " 'Permanently unconscious' means a condition which, to a reasonable degree of medical probability, as determined solely by the patient's attending physician and one (1) other physician on clinical examination, is characterized by an absence of cerebral cortical functions indicative of consciousness or behavioral interaction with the environment." KRS 311.621(12).

2. "Persistent vegetative state is a condition having the following characteristics:

 "*Basic Definition (Functional):* Irreversible loss of all neocortical functions; brain stem functions intact.

 "*Clinical Syndrome:* Awake, but unaware; eyes-open unconsciousness; sleep/wake cycles present; respirator independence.

 "*Anatomic Substrate of Neurologic Damage:* Varies, but most commonly extensive destruction of neocortex (*see* n. 8, hypoxic-ischemic encephalopathy, *i.e.*, brain dysfunction or damage [caused by] a respiratory or cardiac arrest . . . or significant respiratory or cardiac compromise), or subcortical white matter (head trauma).

 "*Onset and Course:* Sudden onset, secondary to hypoxic-ischemic insult or acute head trauma.

 "*Prognosis for Survival in Terms of Cardio-Respiratory Functions:* Usually long-term, years or even decades.

 "*Time When Prognosis for Recovery of Neurologic Functions Can be Determined with a High Degree of Certainty:* Varies by cause; in hypoxic-ischemic encephalopathy, usually 1–3 months; in head trauma, usually 6–12 months.

 "*Degree of Physical or Psychological Suffering:* None."
 Coordinating Council on Life–Sustaining Medical Treatment Decision Making by the Courts, *Guidelines for State Court Decision Making in Life–Sustaining Medical Treatment Cases* 175 app. B (2d ed. rev.1993).

3. *Cruzan v. Director, Mo. Dep't of Health,* 497 U.S. 261, 339, 110 S.Ct. 2841, 2883, 111 L.Ed.2d 224 (1990) (Stevens, J., dissenting).

4. The dissenting opinion inaccurately reports that Woods regained consciousness, *post* at 58–59 and "made a recovery," *post* at 59–60. Although Dr. Suhl reported that during one examination, Woods opened his eyes and appeared to respond to pain stimuli, he did not claim that Woods ever regained consciousness, much less recovered. At best, Dr. Suhl's report indicated a temporary, partial progression from permanent unconsciousness

Dr. Suhl estimated that Woods's biological functions could be maintained for one to two years on ventilation, and possibly up to ten years, but that if the ventilator were removed, death would occur in less than forty-eight hours. Drs. Suhl and Robertson both recommended withdrawing artificial ventilation so that the mechanically interrupted natural process of dying could conclude. They did not recommend withdrawal of the artificially administered nutrition and hydration until after death occurred.[5] After a two-hour meeting with Dr. Suhl and CHR, the eleven members (including four physicians) of the St. Joseph Hospital ethics committee unanimously agreed with the recommendation.[6] CHR filed a motion in the Fayette District Court seeking judicial approval of the recommendation. The district court appointed a guardian ad litem for Woods, held a hearing, and accepted briefs on the issue. St. Joseph Hospital filed an amicus brief supporting the motion. During the course of these proceedings, Woods was transferred to Vencor Hospital in Louisville where Dr. Arthur T. Hurst, Jr. assumed responsibility for his treatment. Dr. Hurst agreed with the diagnosis and prognosis reached by Drs. Suhl and Robertson and strongly agreed with the recommendation to terminate Woods's life-prolonging treatment: "I regard continuing such heroic measures as a violation of the Hippocratic Oath and in abdication of the Judeo–Christian ethic by which I was raised. Frankly, I do not see much difference between what we are doing here and some of the atrocities that we read about in Bosnia." [7]

On September 21, 1995, the district court entered an opinion and order holding that KRS 311.631 authorizes a judicially-appointed guardian of an adult patient who lacks decisional capacity and has not made an "advance directive," to make health care decisions on behalf of the patient, including withdrawal of artificial life-support systems, without obtaining advance judicial approval, so long as the guardian

---

toward a persistent vegetative state. See note 2, *supra*, for the clinical syndrome of a persistent vegetative state, *viz:* "Awake, but unaware; eyes-open unconsciousness; sleep/wake cycles present .... " However, Woods never reached the fourth facet of the clinical syndrome, *i.e.*, "respirator independence;" and the record is clear that, shortly after Dr. Suhl's report, Woods relapsed into a state of complete permanent unconsciousness which continued until his legal death.

5. Contrary to the inferences advanced in the dissenting opinion, *post* at 58–62, no one in this case ever proposed removal of Woods's artificial nutrition and hydration support systems.

6. St. Joseph Hospital is an arm of the Roman Catholic Sisters of Charity of Nazareth Health Care System. Sister Kathleen Bohan, a member of the ethics committee, holds a masters degree in nursing, a doctorate degree in higher education administration with minors in theology, psychology, and psychiatry, and is the former dean of the school of nursing at Georgetown University in Washington, D.C. After personally examining Woods and reviewing his medical records, she testified:

> [H]e's just lying there hooked up to these machines and breathing from the machine and has no, no independent life of his own, or anything about life that he can enjoy or get any satisfaction from, or relate to anybody with him.... I would just take him off of the machines, and let nature take its course, because I think that is a dignified way to die. Not to have to fight against a machine, or get so depleted that even a machine can't help anymore.

7. The dissenting opinion, post at 58–59 quotes the second sentence of Dr. Hurst's remarks out of context to suggest that Dr. Hurst likened the removal of artificial life-support to the atrocities committed in Bosnia. Obviously, he was referring to the artificial mainte-

acts in good faith and in the best interest of the patient.

The guardian ad litem appealed to the Fayette Circuit Court, asserting that KRS 311.631 is unconstitutional or, if constitutional, the judicially-appointed guardian must prove by clear and convincing evidence that withdrawing artificial life support is in the patient's best interests; and that the statute violates public policy and modern ethical standards. Woods died of natural causes on June 2, 1996, before the circuit court could rule on the appeal; accordingly, the circuit court dismissed it as moot. The Court of Appeals reversed and remanded, citing an exception to the mootness doctrine, applicable when the underlying dispute is " 'capable of repetition, yet evading review." ' *Lexington Herald–Leader Co. v. Meigs,* Ky., 660 S.W.2d 658, 661 (1983) (quoting *Neb. Press Ass'n v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976)); *see also Commonwealth v. Hughes,* Ky., 873 S.W.2d 828, 830 (1994).

On remand, the Fayette Circuit Court entered a comprehensive opinion holding that KRS 311.631 is constitutional and does not require proof of the patient's best interest by clear and convincing evidence; that withdrawal of artificial life support systems from a permanently unconscious patient does not violate public policy or modern ethical standards if the decision is made in good faith and is in the ward's best interest; and that there is no need to obtain prior judicial approval of a decision to do so absent a dispute among interested parties as to the soundness of the deci-

sion.[8] The Court of Appeals granted discretionary review and affirmed. We also granted discretionary review and affirm the holdings of the lower courts except as to the standard of proof. In that respect, we hold that the withdrawal of artificial life support from a patient is prohibited absent clear and convincing evidence that the patient is permanently unconscious or in a persistent vegetative state and that withdrawing life support is in the patient's best interest.

We do not write on a clean slate. Since the Supreme Court of New Jersey's seminal decision in *In re Quinlan,* 70 N.J. 10, 355 A.2d 647 (1976), many state courts, including this Court, *DeGrella by Parrent v. Elston,* Ky., 858 S.W.2d 698 (1993), as well as the United States Supreme Court, *Cruzan, supra* note 3, have addressed various issues relating to the right of a terminally ill patient to refuse unwanted life-prolonging treatment.[9] Because the guardian ad litem asserts that *DeGrella* precludes the result we reach in this case, we first examine the context in which *DeGrella* was decided.

## I. COMMON LAW BACKGROUND.

As in *DeGrella, supra,* Woods's guardian ad litem does not question the right of a competent person to forego medical treatment by either refusal or withdrawal. *Id.* at 703 (quoting *Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891), *superseded by rule on other grounds as stated by Privee v. Burns,* 46 Conn.Supp. 301,

---

nance of Woods's biological existence where there was no hope of recovery.

8. Woods's brother expressed mild disagreement with the recommendation, and his niece declined to agree or disagree. Both declined to be appointed as a successor limited guardian. KRS 387.090(3).

9. The so-called "right to die" does not extend to euthanasia or mercy killing, *DeGrella,* 858 S.W.2d at 707, or to suicide or assisted suicide. *Vacco v. Quill,* 521 U.S. 793, 807–09, 117 S.Ct. 2293, 2301–02, 138 L.Ed.2d 834 (1997); *Washington v. Glucksberg,* 521 U.S. 702, 735, 117 S.Ct. 2258, 2275, 138 L.Ed.2d 772 (1997).

749 A.2d 689, 695–96 (1999); and *Schloendorff v. Soc'y of N.Y. Hosp.*, 211 N.Y. 125, 105 N.E. 92, 93 (1914), *abrogated on other grounds by Bing v. Thunig*, 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3, 9 (1957), and *superseded by statute on other grounds as stated by Retkwa v. Orentreich*, 154 Misc.2d 164, 584 N.Y.S.2d 710 (1992)). That right derives from the common law rights of self-determination and informed consent, *DeGrella*, 858 S.W.2d at 709; *see also Cruzan*, 497 U.S. at 270, 110 S.Ct. at 2847 ("The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment."); and in the liberty interest protected by the Fourteenth Amendment to the United States Constitution ("nor shall any State deprive any person of life, liberty, or property, without due process of law"),[10] *id.* at 278, 110 S.Ct. at 2851 ("The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions."); and, perhaps even more so, by Section 1 of the Constitution of Kentucky ("All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned: First: The right of *enjoying and defending* their lives and liberties.") (emphasis added). *But see Quinlan*, 355 A.2d at 663 (right to refuse treatment was a corollary of the right to privacy expressed in cases such as *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973), and *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)). However, this right is not absolute. The individual's liberty interest must be balanced against relevant state interests. *Cruzan*, 497 U.S. at 279,

110 S.Ct. at 2851–52. Courts and commentators have identified four state interests that may limit a person's right to refuse medical treatment: (1) preserving life; (2) preventing suicide; (3) safeguarding the integrity of the medical profession; and (4) protecting innocent third parties. *E.g., Satz v. Perlmutter*, 362 So.2d 160, 162 (Fla.App.1978); *Superintendent of Belchertown State Sch. v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417, 425 (1977); *In re Conservatorship of Torres*, 357 N.W.2d 332, 339 (Minn.1984); *In re Conroy*, 98 N.J. 321, 486 A.2d 1209, 1223 (1985); *In re Colyer*, 99 Wash.2d 114, 660 P.2d 738, 743 (1983) (en banc); President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, *Deciding to Forego Life–Sustaining Treatment* 31–32 (1983) (hereinafter "President's Commission").

 It is also universally accepted that the state may not deprive citizens of their constitutional rights solely because they do not possess the decisional capacity to personally exercise them. *Youngberg v. Romeo*, 457 U.S. 307, 315, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982) (certain liberty interests still intact after involuntary commitment); *Jackson v. Indiana*, 406 U.S. 715, 731, 92 S.Ct. 1845, 1854, 32 L.Ed.2d 435 (1972) (indefinite commitment of criminal defendant incompetent to stand trial violates Fourteenth Amendment right of due process). Thus, the right to refuse medical treatment embodied in the constitutional liberty interest extends not only to the competent but also to the incompetent, "because the value of human dignity extends to both." *Saikewicz*, 370 N.E.2d at 427. *See also Rasmussen by Mitchell v. Fleming*, 154 Ariz. 207, 741 P.2d 674, 685–

---

10. This case implicates the Fourteenth Amendment because Woods was a ward of the Commonwealth, and the guardian who sought to withdraw his artificial life support was an agent of the Commonwealth. *In re Guardianship of L.W.*, 167 Wis.2d 53, 482 N.W.2d 60, 71 (1992).

86 (1987) (en banc); *Conservatorship of Drabick*, 200 Cal.App.3d 185, 245 Cal.Rptr. 840, 855 (1988), *abrogated by statute on other grounds as recognized by In re Conservatorship of Wendland*, 26 Cal.4th 519, 110 Cal.Rptr.2d 412, 28 P.3d 151, 165 (2001); *Foody v. Manchester Mem'l Hosp.*, 40 Conn.Supp. 127, 482 A.2d 713, 718 (1984); *Severns v. Wilmington Med. Ctr., Inc.*, 421 A.2d 1334, 1347 (Del.1980); *John F. Kennedy Mem'l Hosp. v. Bludworth*, 452 So.2d 921, 926 (Fla.1984); *In re P.V.W.*, 424 So.2d 1015, 1019 (La.1982); *In re Martin*, 450 Mich. 204, 538 N.W.2d 399, 406 (1995); *Quinlan*, 355 A.2d at 664; *Eichner v. Dillon*, 73 A.D.2d 431, 426 N.Y.S.2d 517, 546 (N.Y.App.Div.1980) ("To deny the exercise because the patient is unconscious is to deny the right."), *aff'd*, 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64, 70–72 (1981); *In re Guardianship of Hamlin*, 102 Wash.2d 810, 689 P.2d 1372, 1376 (1984) (en banc); *In re Guardianship of L.W.*, *supra* note 10, at 73–74; David W. Meyers, *Medico–Legal Implications of Death and Dying* § 11.6, at 274 (1981). Courts have identified three methods by which to determine whether an incompetent's right to refuse or terminate artificial life-support systems should be exercised:

*(1) Previously expressed desires.*

The explicit wishes of an incompetent patient regarding extraordinary life-prolonging treatment should be respected if expressed while competent.[11] *See Cruzan*, 497 U.S. at 289–90, 110 S.Ct. at 2857–58 (O'Connor, J., concurring) (noting validity of such instructions); *Wendland*, 110 Cal. Rptr.2d 412, 28 P.3d at 165 (construing California Probate Code § 2355 as assigning dispositive weight to incompetent's prior informally expressed wishes). Wishes expressed in a written document,

*i.e.*, a living will, provide the clearest evidence of a person's desires. *Knight v. Beverly Health Care Bay Manor Health Care Ctr.*, 820 So.2d 92, 99 (Ala.2001) (but incompetent patient's relatives argued that she did not understand the ramifications of her living will when she executed it); *In re Guardianship of Browning*, 568 So.2d 4, 16 (Fla.1990) (patient's own written declaration or designation of proxy creates rebuttable presumption of patient's wishes); *Bludworth*, 452 So.2d at 926 (living will is persuasive evidence of incompetent patient's intent and is entitled to great weight); *Conroy*, 486 A.2d at 1229 (living will is one of several types of evidence of person's wishes against extraordinary life-sustaining treatment); Mark Strasser, *Incompetents and the Right to Die: In Search of Consistent Meaningful Standards*, 83 Ky. L.J. 733, 747 (1994–95) ("It is reasonable for courts to employ a rebuttable presumption that the living will represents the competent individual's informed preferences."). However, unequivocal oral statements also carry great weight. *Eichner v. Dillon*, 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64, 72 (1981) (Whether someone other than the patient can authorize discontinuance of life-sustaining treatment "is not presented in this case because here [the patient] made the decision for himself before he became incompetent.").

*(2) Substituted judgment.*

If the incompetent's own unequivocal wishes are unknown, some courts have permitted a guardian or designated surrogate, or if none, a family member or close associate, to make a substituted judgment as to what the incompetent would have decided had he or she been competent.

---

11. Such statements are admissible under KRE 803(3), the "state-of-mind" exception to the hearsay rule, because the statement re-

lates to future intent, not to a fact remembered. *See DeGrella*, 858 S.W.2d at 709.

The only practical way to prevent destruction of the [incompetent person's constitutional] right is to permit the guardian and family of [the patient] to render their best judgment ... as to whether she would exercise it in these circumstances.

*Quinlan,* 355 A.2d at 664. This inquiry is a subjective one in which "the court ... must ... act upon the same motives and considerations as would have moved [the patient]." *In re A.C.,* 573 A.2d 1235, 1249 (D.C.1990) (en banc) (internal quotations omitted); Norman L. Cantor, *Legal Frontiers of Death and Dying* 63 (1987) ("Under the substituted judgment approach, the surrogate decision-maker must effectuate, to the extent possible, the course of conduct which the patient would have desired.").

Under the substituted judgment doctrine, ... [t]he surrogate considers the patient's prior statements about and reactions to medical issues, and all the facets of the patient's personality that the surrogate is familiar with—with, of course, particular reference to his or her relevant philosophical, theological, and ethical values—in order to extrapolate what course of medical treatment the patient would choose.

*In re Jobes,* 108 N.J. 394, 529 A.2d 434, 444 (1987) (citing *In re Roe,* 383 Mass. 415, 421 N.E.2d 40, 56–59 (1981)). *See also In re Tavel,* 661 A.2d 1061, 1068–69 (Del.1995); *Guardianship of Doe,* 411 Mass. 512, 583 N.E.2d 1263, 1268 (1992) (factors include "[1] the patient's expressed preferences; [2] the patient's religious convictions and their relation to refusal of treatment; [3] the impact on the patient's family; [4] the probability of adverse side effects; and [5] the prognosis with and without treatment"); *In re Fiori,* 438 Pa.Super. 610, 652 A.2d 1350, 1356 (1995) (reciting same considerations), *aff'd,* 543 Pa. 592, 673 A.2d 905 (1996).

The scope of the evidence that may be received in the inquiry is as wide as the concepts of relevance and materiality are to the state of mind issue. Oral, as well as written, statements of the ward, made prior to the ward's incompetency, should be considered. Evidence of this character will *include any actual, expressed intent* or *desire* to *have artificial sustenance withdrawn,* but the evidence is not limited to specific, subjective intent evidence. The patient's " 'philosophical, religious and moral views, life goals, values about the purpose of life and the way it should be lived, and attitudes toward sickness, medical procedures, suffering and death" ' should be explored.

*Mack v. Mack,* 329 Md. 188, 618 A.2d 744, 758 (1993) (quoting *Jobes,* 529 A.2d at 445 (quoting Steven A. Newman, *Treatment Refusals for the Critically and Terminally III: Proposed Rules for the Family, the Physician and the State,* 3 N.Y.L. Sch. Hum. Rts. Ann. 35, 47 (1985))). The incompetent's attitudes should be considered even if contrary to convention. "The right of self-determination, both for competents and incompetents, is understood to include the right to refuse treatment even when such refusal would be neither in one's best interest, nor in agreement with what most rational or reasonable persons would elect to do in similar circumstances." Allen E. Buchanan, *The Limits of Proxy Decision-making for Incompetents,* 29 UCLA L.Rev. 386, 389–90 (1981).

*(3) Best interest.*

Where no reliable evidence of the patient's intent exists, precluding substitution of the incompetent's judgment, courts have permitted the surrogate to base the decision on an objective inquiry into the incompetent patient's best interest. *Ras-*

*mussen,* 741 P.2d at 689; *Drabick,* 245 Cal.Rptr. at 856–57; *Foody,* 482 A.2d at 721; *Martin,* 538 N.W.2d at 407; *Torres,* 357 N.W.2d at 337; *Conroy,* 486 A.2d at 1231; *L.W.,* 482 N.W.2d at 70. The decision is not based on the surrogate's view of quality of life, but " 'the value that the continuation of life has for the patient, . . .' not 'the value that others find in the continuation of the patient's life. . . .' " *Rasmussen,* 741 P.2d at 689 n. 23 (quoting President's Commission, at 135 n. 43), *quoted in L.W.,* 482 N.W.2d at 73.

In these situations surrogate decision-makers . . . must try to make a choice for the patient that seeks to implement what is in that person's best interests by reference to more objective, societally shared criteria. Thus the best interests standard does not rest on the value of self-determination but solely on protection of patients' welfare.

In assessing whether a procedure or course of treatment would be in a patient's best interests, the surrogate must take into account such factors as the relief of suffering, the preservation or restoration of functioning, and the quality as well as the extent of life sustained.

President's Commission, at 134–35. Courts have established various criteria to consider in determining whether it is in the best interest of a patient who is permanently unconscious or in a persistent vegetative state to remove artificial life-prolonging treatment.

"[E]vidence about the patient's present level of physical, sensory, emotional, and cognitive functioning; the degree of physical pain resulting from the medical condition, treatment, and termination of the treatment, respectively; the degree of humiliation, dependence, and loss of dignity probably resulting from the condition and treatment; the life expectancy and prognosis for recovery with and without treatment; the various treatment options; and the risks, side effects, and benefits of each of those options."

*In re Rosebush,* 195 Mich.App. 675, 491 N.W.2d 633, 640 (1992) (quoting *Conroy,* 486 A.2d at 1249 (Handler, J., concurring in part and dissenting in part)).

We conclude that a court making the decision of whether to withhold or withdraw life-sustaining medical treatment . . . should consider the following factors: (1) the [patient's] present levels of physical, sensory, emotional and cognitive functioning; (2) the quality of life, life expectancy and prognosis for recovery with and without treatment, including the futility of continued treatment; (3) the various treatment options, and the risks, side effects, and benefits of each; (4) the nature and degree of physical pain or suffering resulting from the medical condition; (5) whether the medical treatment being provided is causing or may cause pain, suffering, or serious complications; (6) the pain or suffering . . . if the medical treatment is withdrawn; (7) whether any particular treatment would be proportionate or disproportionate in terms of the benefits to be gained . . . versus the burdens caused to the [patient]; (8) the likelihood that pain or suffering resulting from withholding or withdrawal of treatment could be avoided or minimized; (9) the degree of humiliation, dependence and loss of dignity resulting from the condition and treatment; (10) the opinions of the family, the reasons behind those opinions, and the reasons why the family either has no opinion or cannot agree on a course of treatment; [and] (11) the motivations of the family in advocating a particular course of treatment . . . .

*In re Christopher I.,* 106 Cal.App.4th 533, 131 Cal.Rptr.2d 122, 134–35 (2003) (dealing with dependent child), *overruled by impli-*

*cation on other grounds by In re Zeth S.,* 31 Cal.4th 396, 2 Cal.Rptr.3d 683, 73 P.3d 541, 552–53 (2003).

## II. 1990 LEGISLATION.

When this Court rendered *DeGrella* in 1993, the only statutory authorities pertaining to this subject were the 1990 enactments of the Kentucky Living Will Act, KRS 311.622–.644 (1990 Ky. Acts, ch. 122), and the Health Care Surrogate Act of Kentucky, KRS 311.970–.986 (1990 Ky. Acts, ch. 123). (As noted in Part IV of this opinion, *infra,* both of those Acts were repealed by 1994 Ky. Acts, ch. 235, § 13.)

The Living Will Act permitted a person with decisional capacity to execute a written declaration directing that life-prolonging treatment be withheld or withdrawn so that the declarant could die a natural death in the event that two physicians, including the attendant physician, diagnosed the declarant with a terminal condition that was "incurable and irreversible," and would "result in death within a relatively short time" (duration not further specified) so that life-prolonging treatment would only prolong the dying process. KRS 311.626.

The Health Care Surrogate Act permitted a person with decisional capacity to execute a written declaration designating one or more adults to make health care decisions on the declarant's behalf should the declarant lack decisional capacity, as determined by the declarant's attending physician. KRS 311.972, .974, .978. The surrogate was required to act "in accordance with accepted medical practice" and to consider the recommendation of the attending physician, the decision the declarant would have made, if known ("substituted judgment"), and the best interest of the declarant. However, the surrogate could only consent to the withholding of nutrition or hydration (a) when inevitable death was imminent, specifically within a few days; or (b) "when the provision of artificial nutrition [could not] be physically assimilated" by the declarant; or (c) "when the burden of the provision of artificial nutrition and hydration ... [outweighed] its benefit, provided that the determination of the burden [would] refer to the provision itself and not to the quality of the continued life" of the declarant. Further, artificial nutrition or hydration could not be withheld if "needed for comfort or the relief of pain." KRS 311.978(3).

The Living Will Act prohibited the withholding or withdrawal of life-support systems from a female patient known to be pregnant. KRS 311.626. The Health Care Surrogate Act permitted the withholding or withdrawal of life-sustaining treatment from a pregnant woman if it would not "maintain the woman in such a way as to permit the continuing development and live birth of the unborn child," or if the treatment would cause the patient physical harm or "prolong severe pain" which could not be "alleviated by medication." KRS 311.978(4). Both Acts contained provisions for revocation of the declaration, KRS 311.630; KRS 311.976, and both provided that actions taken in compliance with a declaration would not give rise to civil or criminal liability. KRS 311.632; KRS 311.984(1). The Living Will Act provided that a declaration under the Act or an action in conformance therewith would not constitute suicide, KRS 311.638, and that nothing in the Act should be "construed as condon[ing], authoriz[ing] or approv[ing] mercy killing or euthanasia" or "any affirmative or deliberate act to end life other than to permit the natural process of dying." KRS 311.636. The Health Care Surrogate Act made no reference to euthanasia or mercy killing, perhaps because such were inferentially precluded by the restrictions on the surrogate's authority as set forth in KRS 311.978. Both Acts

provided that any action taken pursuant to the Act would not impair contractual rights under a life insurance policy. KRS 311.984; KRS 311.638.

■ Neither Act authorized withholding or removal of life-support systems from an incompetent patient who had not executed in writing, when competent to do so, either a living will or a designation of a health care surrogate. *DeGrella,* 858 S.W.2d at 706 ("[N]either of these statutes specifically applies to the present situation, and when we study them looking for a policy overriding the common law right to refuse medical treatment, they send mixed messages."). Thus, *DeGrella* considered only the common law developments discussed in Part I of this opinion, *supra.*

### III. DEGRELLA.

Martha Sue DeGrella's brain was damaged by an acute subdural hematoma caused by a savage beating. She languished in a persistent vegetative state with her biological life maintained only by artificially supplied ventilation, nutrition, and hydration. Unlike Matthew Woods, she was able to react on a reflexive level to painful stimuli and apparently did not suffer from myoclonus. Also unlike Woods, she had expressed, when competent, her wishes against the use of artificial life-sustaining treatment, specifically expressing abhorrence at the plight of Karen Ann Quinlan (*Quinlan, supra*). On another occasion after being injured in an automobile accident, she protested being put on a respirator even though there was no question that she would recover. Employing the "substituted judgment" inquiry, we upheld the trial court's decision to permit DeGrella's guardian to authorize withdrawal of her artificial life-support systems.

We recognize that previous oral statements cannot be considered conclusive in nature. The oral directives the patient gives to a family member, friend or health care provider are of significant value as a relevant evidentiary consideration, but there are other evidentiary matters which may outweigh such statements, such as written directives to the contrary, reactions the patient voiced regarding particular types of medical treatment, religious beliefs and the tenets of that religion, or the patient's consistent pattern of conduct with respect to prior decisions about his own medical care.

. . .

[The patient's] statements of choice made before she became incompetent, while not dispositive of the question at hand, are competent evidence upon which a surrogate decision-maker could exercise judgment in the circumstances presented.

*DeGrella,* 858 S.W.2d at 708–09.

We grounded our decision in *DeGrella* primarily in the common law right of self-determination and informed consent, *id.* at 709, and on the "substituted judgment" principle enunciated in *Strunk v. Strunk,* Ky., 445 S.W.2d 145 (1969), wherein the mother/guardian of an incompetent adult was permitted to authorize transplantation of the ward's kidney into the body of his competent brother.

"The right to act for the incompetent in all cases has become recognized in this country as the doctrine of substituted judgment and is broad enough not only to cover property but also to cover all matters touching on the well-being of the ward."

*DeGrella,* at 704 (quoting *Strunk,* 445 S.W.2d at 148). *DeGrella* also pointed to the reasoning in *Strunk* that the ward was so dependent upon his brother that losing him would have jeopardized the ward's

well-being ("best interest" ?) more than the loss of a kidney. *Id.* (quoting *Strunk, supra,* at 146). We then cited with approval the following passage from *Rasmussen:*

> "Under the substituted judgment standard, the guardian 'attempt[s] to reach the decision that the incapacitated person would make if he or she were able to choose.' ... This standard best guides a guardian's decisionmaking when a patient has manifested his or her intent while competent."

*DeGrella,* at 705 (quoting *Rasmussen,* 741 P.2d at 688 (internal citations omitted)).

The guardian ad litem naturally attaches great significance to the sentence immediately following the *Rasmussen* quote, *viz*:

> We do not go the next step, as the Arizona court did in the *Rasmussen* case, to decide that "best interest" can extend to terminating life-sustaining medical treatment where the wishes of the ward are unknown.

*Id.* However, we said that "[w]e *do* not go to the next step," not that "we *would* not go." Our statement was an expression of restraint because the facts in *DeGrella* did not require us to reach the "best interest" analysis, as the case could be decided on the basis of "substituted judgment." The guardian ad litem also emphasizes the following statement of policy expressed as *obiter dictum* in the opinion:

> As long as the case is confined to substitute decision-making by a surrogate in conformity with the patient's previously expressed wishes, the case involves only the right of self-determination and not the quality of life. However, as evidence regarding the patient's wishes weakens, the case moves from self-determination towards a quality-of-life test. At the point where the withdrawal of life-prolonging medical treatment becomes solely another person's decision

about the patient's quality of life, the individual's "inalienable right to life," as so declared in the United States Declaration of Independence and protected by Section One (1) of our Kentucky Constitution, outweighs any consideration of the quality of life, or the value of the life, at stake. Nothing in this Opinion should be construed as sanctioning or supporting euthanasia, or mercy killing. *We do not approve* permitting anyone to decide when another should die on any basis other than clear and convincing evidence that the patient would choose to do so.

*Id.* at 702 (emphasis added). Although the statement referred to the individual's inalienable right to life, it did not mention the individual's inalienable right to liberty. *Cf. Cruzan,* 497 U.S. at 281, 110 S.Ct. at 2853 ("It cannot be disputed that the Due Process Clause protects an interest in life as well as an interest in refusing life-sustaining medical treatment."). That may have been because, unlike the case *sub judice,* the guardian seeking to authorize withdrawal of DeGrella's artificial life support was her mother, not a state agency; thus, arguably the Fourteenth Amendment analysis in *Cruzan* did not apply. *See United States v. Morrison,* 529 U.S. 598, 621, 120 S.Ct. 1740, 1756, 146 L.Ed.2d 658 (2000) (Fourteenth Amendment applies only to state action); *but see L.W.,* 482 N.W.2d at 71 ("[A] guardian is a state actor. A guardian's authority derives from the state's *parens patriae* power and is purely statutory."). Finally, we note that had DeGrella's mother been her health care surrogate under the Health Care Surrogate Act, rather than a judicially-appointed guardian, she would have been *required* by KRS 311.978(1), *supra,* to consider "the recommendation of the attending physician, the decision the grantor *would have made* if the grantor then had decisional capacity, if known, *and*

the decision that would be in the *best interest* of the grantor." (Emphasis added.)

## IV. 1994 LEGISLATION.

Within a year after we rendered *DeGrella,* the General Assembly repealed the Kentucky Living Will Act and the Health Care Surrogate Act of Kentucky, 1994 Ky. Acts, ch. 235, § 13, and enacted in their place the Kentucky Living Will Directive Act, KRS 311.621–.643.1994 Ky. Acts, ch. 235, §§ 1–12. This Act combines the provisions of the former Living Will Act and Health Care Surrogate Act and adds a new provision, KRS 311.631, which provides, *inter alia*:

(1) If an adult patient, who does not have decisional capacity, has not executed an advance directive or to the extent the advance directive does not address a decision that must be made, *any one (1) of the following responsible parties,* in the following order of priority if no individual in a prior class is reasonably available, willing, and competent to act, *shall be authorized to make health care decisions on behalf of the patient:*

 (a) *The judicially-appointed guardian of the patient,* if the guardian has been appointed and if medical decisions are within the scope of the guardianship;

 (b) The spouse of the patient;

 (c) An adult child of the patient, or if the patient has more than one (1) child, the majority of the adult children who are reasonably available for consultation;

 (d) The parents of the patient;

 (e) The nearest living relative of the patient, or if more than one (1) relative of the same relation is reasonably available for consultation, a majority of the nearest living relatives.

. . .

(3) An individual authorized to consent for another under this section shall act *in good faith,* in accordance with any advance directive executed by the individual who lacks decisional capacity, and *in the best interest* of the individual who does not have decisional capacity.

(4) An individual authorized to make a health care decision under this section may authorize the *withdrawal or withholding of artificially-provided nutrition and hydration only in the circumstances set forth in KRS 311.629(3).*

(Emphasis added.) KRS 311.629(3) lists the same circumstances listed in former KRS 311.978(3), *viz*:

(3) A health care surrogate may authorize the withdrawal or withholding of artificially-provided nutrition and hydration in the following circumstances:

 (a) When inevitable death is imminent, which for the purposes of this provision shall mean when death is expected, by reasonable medical judgment, within a few days; or

 . . .

 (c) When the provision of artificial nutrition cannot be physically assimilated by the person; or

 (d) *When the burden of the provision of artificial nutrition and hydration itself shall outweigh its benefit.* Even in the exceptions listed in paragraphs (a), (b), and (c) of this subsection, artificially provided nutrition and hydration shall not be withheld or withdrawn if it is needed for comfort or the relief of pain.

(Emphasis added.) It also added as a new circumstance subsection (3)(b):

> (b) When a patient is in a *permanently unconscious* state *if the grantor has executed an advance directive* authorizing the withholding or withdrawal of artificially-provided nutrition and hydration.

(Emphasis added.)

█ Although not specifically stated in KRS 311.631(3), the legislative intent in enacting the statute obviously was to authorize a surrogate acting in good faith to direct the withholding or withdrawal of life-prolonging treatment from an "adult patient" lacking decisional capacity who has not executed an advance directive pertaining to that decision if doing so would be in the patient's best interest. Any other construction would render meaningless KRS 311.631(4), which imposes further restrictions if the life-supporting treatment consists of artificially-provided nutrition and hydration. Further, if KRS 311.631 did not pertain to the withholding or withdrawal of life-prolonging treatment, the statute would have no purpose with respect to a guardianship because KRS 387.660(3) already establishes a guardian's authority over most lesser forms of treatment. *Reyes v. Hardin County*, Ky., 55 S.W.3d 337, 342 (2001) ("The universal rule is, that in construing statutes it must be presumed that the [l]egislature intended *something* by what it attempted to do. All statutes are presumed to be enacted for the furtherance of a purpose on the part of the legislature and should be construed so as to accomplish that end rather than to render them nugatory." (internal quotations and citations omitted)). Our conviction in this regard is reinforced by the fact that KRS 311.631 was enacted as a part of the Kentucky Living Will Directive Act, the primary purpose of which is to provide for end-of-life decision-making.

We reject the argument of two of our amici that a guardian's authority with respect to health care decisions is restricted to those powers described in KRS 387.660(3). KRS 311.631 is a later enactment (1994) than KRS 387.660, 1982 Ky. Acts, ch. 141, § 17, and thus prevails. *Butcher v. Adams*, 310 Ky. 205, 220 S.W.2d 398, 400 (1949) (If two statutes are irreconcilable, the later enactment prevails.). KRS 311.631 also controls because it specifically deals with the subject matter, *i.e.*, authority over end-of-life decisions, unlike KRS 387.660, which addresses authority over healthcare decisions in general. *Commonwealth v. Phon*, Ky., 17 S.W.3d 106, 107–08 (2000); *DeStock # 14, Inc. v. Logsdon*, Ky., 993 S.W.2d 952, 959 (1999).

█ Furthermore, it is presumed that when the legislature amends a law, the purpose of the amendment is to effect a change in the law. *Louisville Country Club v. Gray*, 178 F.Supp. 915, 918 (W.D.Ky.1959), *aff'd*, 285 F.2d 532 (6th Cir.1960); 73 Am.Jur.2d *Statutes* § 65 (2001). We have no difficulty concluding that the legislative purpose in enacting KRS 311.631 less than one year after the rendition of *DeGrella* was to reject *De-Grella*'s *obiter dictum* that artificial life-prolonging treatment can only be withdrawn from a patient who is permanently unconscious or in a persistent vegetative state under a subjective substituted judgment analysis with no consideration of quality of life, *i.e.*, an objective consideration of the patient's best interest. By enacting KRS 311.631, the General Assembly has protected the liberty interests of those who either were never competent or, if once competent, failed to express a point of view on the subject. We assume that the General Assembly intended that the patient's best interest be ascertained under KRS 311.631(3) from both subjective

evidence (as in a common law substituted judgment analysis, *supra* ) and objective evidence (as in a common law best interest analysis, *supra* ),[12] as available. We elaborate that in determining the best interest of the patient, "quality of life" is not considered from the subjective point of view of the surrogate, but is an objective inquiry into "the value that the continuation of life has for the patient." *Rasmussen*, 741 P.2d at 689 n. 23 (quoting President's Commission, at 135 n. 43), *quoted in L.W.*, 482 N.W.2d at 73. *See also In re Christopher I.*, 131 Cal.Rptr.2d at 134 ("quality of life, life expectancy and prognosis for recovery with and without treatment, including the futility of continued treatment"); *Rosebush*, 491 N.W.2d at 640 (" 'degree of humiliation, dependence, and loss of dignity' ") (quoting *Conroy*, 486 A.2d at 1249 (Handler, J., concurring in part and dissenting in part)); President's Commission, at 135 ("quality as well as the extent of life sustained").

 We also reject the argument of two of our amici that KRS 311.631(1) does not apply to Woods because he was not an "adult" as defined in KRS 311.621(1), *viz:* " 'Adult' means a person eighteen (18) years of age or older and who is of sound mind." Obviously, that definition applies when the word is used as a noun, as in KRS 311.623 ("An adult with decisional capacity may make a written living will directive . . . ."), and "sound mind" refers to testamentary capacity. In KRS 311.631(1), "adult" is used as an adjective to indicate that the provision does not apply to a child, *viz:* "If an adult patient, who does not have decisional ca-

pacity . . . ." *See, e.g., Landry v. City of Dearborn*, 259 Mich.App. 416, 674 N.W.2d 697, 700 (2003) ("However, the term 'personnel' is not used in the statute as a noun, but rather as an adjective. Thus, the term can be given a broader meaning."); *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213, 121 S.Ct. 1433, 1441, 149 L.Ed.2d 401 (2001) ("Although we generally presume that identical words used in different parts of the same act are intended to have the same meaning, the presumption is not rigid, and the meaning [of the same words] well may vary to meet the purposes of the law." (internal quotations and citations omitted)). Regardless, "[l]ess mental capacity is required to make a will than to transact business generally." *Nance v. Veazey*, Ky., 312 S.W.2d 350, 354 (1958) (reversing judgment in will contest case because contestant was permitted to introduce evidence of judgment of mental inquest declaring testator incompetent, where incompetence was based on physical *and* mental abilities, whereas testamentary capacity is solely an issue of mental faculties); *Perkins' Guardian v. Bell*, 294 Ky. 767, 172 S.W.2d 617, 622–23 (1943) ("[P]erfect sanity is not a requisite of testamentary capacity and . . . persons distinctly subnormal or abnormal mentally may be competent to make wills."). Likewise, a person who has been judicially declared incompetent to manage his or her estate does not *ipso facto* lack decisional capacity to demand termination of artificial life-prolonging treatment. *In re Estate of Austwick*, 275 Ill.App.3d 665, 212 Ill.Dec. 176, 656 N.E.2d 773, 776–77

---

**12.** There is a rational argument that "best interest" is a more reliable standard than "substituted judgment," *i.e.*, a person who once made a statement of preference may have changed his or her mind in the interim. Strasser, 83 Ky. L.J. at 742–43. To repeat a favorite aphorism, "I don't want to live to be

100, but ask me again when I'm 99." Professor Strasser suggests that a hybrid test may, in fact, be the best approach. *Id.* at 754–55. This methodology is referred to in *Conroy*, 486 A.2d at 1232, as a "limited-objective" best interest test. .

(1995); *Conroy*, 486 A.2d at 1241. Woods was found incapable of managing some of his affairs (CHR's guardianship was only a limited one), but there is no evidence that he lacked testamentary capacity.

## V. CONSTITUTIONAL ISSUES.

 We find no constitutional infirmity *per se* in the Kentucky Living Will Directive Act. It specifically avoids violating the inalienable right to life because it does not "condone, authorize, or approve mercy killing or euthanasia," or "permit any affirmative or deliberate act to end life other than to permit the natural process of dying." KRS 311.639. The statute recognizes a distinction between an affirmative intent to kill and a passive decision to allow a natural death to occur in accordance with a patient's constitutional liberty interest and common law right of self-determination. *Cf. DeGrella*, 858 S.W.2d at 706–07. A corollary to any determination that withdrawal of artificial life-prolonging treatment is in the patient's best interest is that the patient's liberty interest to be free of treatment outweighs any interest the patient may have in maintaining a biological existence. Absent KRS 311.631, there is no way for a person like Woods, who had not made an advance directive, either oral or written, to exercise his constitutional liberty interest. Thus, the statute, by permitting a third party to authorize the termination of life-sustaining treatment, does not violate Woods's constitutional rights but instead provides a mechanism for balancing two competing rights.

 KRS 311.631, however, does not specify any particular diagnosis or prognosis necessary to authorize the withholding or withdrawal of life-prolonging treatment. Taken to its literal extremes, the statute would permit a conservator to withdraw health care necessary to life from any conservatee who had been adjudicated incompetent to make health care decisions, regardless of the degree of mental and physical impairment, and on no greater showing than that the conservator in good faith considered treatment not to be in the conservatee's best interest. The result would be to permit a conservator freely to end a conservatee's life based on the conservator's subjective assessment, albeit "in good faith [and] based on medical advice" . . . that the conservatee enjoys an unacceptable quality of life.

*Wendland*, 110 Cal.Rptr.2d 412, 28 P.3d at 174 (internal citations omitted). To preclude the possibility of such an unconstitutional application, we construe KRS 311.631 in light of KRS 311.629(3) as permitting the withholding or withdrawal of life-prolonging treatment only when the patient is *in extremis, i.e.,* permanently unconscious or in a persistent vegetative state, or when inevitable death is expected by reasonable medical judgment within a few days.

 As noted in Part I of this opinion, *supra*, the patient's right to self-determination must also be balanced against relevant state interests, *Cruzan*, 497 U.S. at 279, 110 S.Ct. at 2851–52, usually regarded as "[1] preserving life; [2] preventing suicide; [3] safeguarding the integrity of the medical profession; and [4] protecting innocent third parties." *Conroy*, 486 A.2d at 1223. Of the four state interests, the strongest is the Commonwealth's interest in preserving the lives of its citizens. However, "the State's interests Contra weakens and the individual's [interest] grows as the degree of bodily invasion increases and the prognosis dims. Ultimately there comes a point at which the individual's rights overcome the State interest." *Quinlan*, 355 A.2d at 664.

At a certain point, treatment serves only to prolong the dying process unnaturally, and at this point the patient's liberty interest in refusing treatment prevails. An unqualified state interest in preserving life irrespective of either a patient's express wishes or of the patient's best interests transforms human beings into unwilling prisoners of medical technology.

*L.W.*, 482 N.W.2d at 74. There was no suicide issue in this case. Nor was the integrity of the medical profession at stake. All of the medical doctors involved in this case agreed that Woods's condition was irreversible and that artificial life-prolonging treatment should be withdrawn for humane reasons. As noted in Part VIII of this opinion, *infra*, the American Medical Association authorizes withdrawal of life-prolonging treatment from persons who are permanently unconscious or in a persistent vegetative state. Finally, there were no third parties to protect. Woods was unmarried and childless. There is no evidence that either his brother or his niece depended on him for monetary or emotional sustenance. In fact, CHR had difficulty even locating them so as to elicit their input into the decision-making process. We conclude that Woods's constitutional right of self-determination far outweighed any interests the Commonwealth may have had in his continued biological existence.

## VI. CLEAR AND CONVINCING EVIDENCE.

 In civil actions, proof by a preponderance of the evidence normally "determines the rights of the parties." *Aetna Ins. Co. v. Johnson*, 74 Ky. (11 Bush) 587, 593 (1874). However, in *DeGrella, supra,* the trial court found by clear and convincing evidence that DeGrella would have chosen to terminate her life-prolonging treatment. Thus, we noted on appeal that we "need not decide whether a mere preponderance of evidence would have sufficed." 858 S.W.2d at 706. Here, however, the lower courts have held that KRS 311.631 does not require proof by clear and convincing evidence. Thus, the issue is squarely presented in this case.

 KRS 311.631 does not specify the standard of proof required to determine whether an incompetent patient or ward is permanently unconscious or in a persistent vegetative state or, if so, whether it is in the incompetent's best interest to withhold or withdraw life-prolonging treatment. However, that "is the kind of question which has traditionally been left to the judiciary to resolve." *Woodby v. INS*, 385 U.S. 276, 284, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966). "In cases involving individual rights, whether criminal or civil, [t]he standard of proof [at a minimum] reflects the value society places on individual liberty." *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979) (internal quotations and citations omitted). It also serves as "a societal judgment about how the risk of error should be distributed between the litigants." *Santosky v. Kramer*, 455 U.S. 745, 755, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599 (1982). In a civil proceeding, Due Process requires a heightened standard of proof "when the individual interests at stake ... are both 'particularly important' and 'more substantial than mere loss of money.'" *Id.* at 756, 102 S.Ct. at 1396 (quoting *Addington*, 441 U.S. at 424, 99 S.Ct. at 1808). "Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss." *Id.* at 758, 102 S.Ct. at 1397. In keeping with this principle, Kentucky has required proof

by clear and convincing evidence in the following situations:

> Among the most common of cases which require proof by clear and convincing evidence are termination of parental rights (*Cabinet for Human Resources v. E.S.,* Ky., 730 S.W.2d 929 (1987)), illegitimacy of a child born in wedlock (*Bartlett v. Commonwealth, ex rel. Calloway,* Ky., 705 S.W.2d 470 (1986)), unfitness of a natural parent for custody of a child (*Davis v. Collinsworth,* Ky., 771 S.W.2d 329 (1989)), proof of a lost will (*Clemens v. Richards,* 304 Ky. 154, 200 S.W.2d 156 (1947)), and fraud (*Larmon v. Miller,* 195 Ky. 654, 243 S.W. 939 (1922); *Ferguson v. Cussins,* Ky.App., 713 S.W.2d 5 (1986)).

*Hardin v. Savageau,* Ky., 906 S.W.2d 356, 357 (1995).

Ironically, the issue presented in *Cruzan, supra,* was not whether protection of the patient's rights required proof by clear and convincing evidence but whether a state could constitutionally require clear and convincing evidence before authorizing the withdrawal or withholding of life-prolonging treatment from an incompetent ward or patient, *i.e.,* whether the patient's liberty interest precluded the erection of the higher evidentiary barrier. 497 U.S. at 280, 110 S.Ct. at 2852. The Court held that it did not.

> The more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision.... An erroneous decision not to terminate results in a maintenance of the status quo; .... An erroneous decision to withdraw life-sustaining treatment, however, is not susceptible of correction.

*Id.* at 283, 110 S.Ct. at 2854.

A consensus has arisen among state courts that the withholding or withdrawal of artificial life-prolonging treatment is authorized only upon a finding of clear and convincing evidence that the incompetent ward or patient is permanently unconscious or in a persistent vegetative state *and* that the ward or patient would choose to withhold or withdraw the life-prolonging treatment if able to do so *or* that it would be in the best interest of the ward or patient to withhold or withdraw the treatment. *See Knight v. Beverly Health Care,* 820 So.2d at 101–02 (requiring clear and convincing evidence that patient is in a persistent vegetative state); *Rasmussen,* 741 P.2d at 691 (these cases involve "life-or-death issues" that "must be resolved by clear and convincing evidence."); *Wendland,* 110 Cal.Rptr.2d 412, 28 P.3d at 166, 174 (construing statute reciting no standard of proof as requiring clear and convincing evidence; standard applies regardless of whether the decision was based on patient's wishes or the patient's best interests "in order to minimize the possibility of its unconstitutional application"); *McConnell v. Beverly Enterprises–Connecticut, Inc.,* 209 Conn. 692, 553 A.2d 596, 605 (1989); *Tavel,* 661 A.2d at 1068–70 (requiring clear and convincing evidence that ward would reject life-sustaining feeding tube if competent); *Browning,* 568 So.2d at 15–16 (in cases where formerly competent patient has designated a proxy or explicitly stated wishes regarding life-sustaining treatment, decision-maker must be satisfied by clear and convincing evidence, *inter alia,* that patient would have refused treatment and that patient will not regain competence); *In re Estate of Longeway,* 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292, 300 (1989) (patient's intent); *In re Swan,* 569 A.2d 1202, 1206 (Me.1990) (per curiam); *Mack,* 618 A.2d at 754 (proponent of withholding or withdrawing life support from person in vegetative state must prove by clear and convincing evidence that patient's decision would have been the same);

*Martin,* 538 N.W.2d at 410 (patient's intent); *Cruzan v. Harmon,* 760 S.W.2d 408, 425 (Mo.1988) (en banc) ("[N]o person can assume that choice for an incompetent in the absence of the formalities required under Missouri's Living Will statutes or the clear and convincing, inherently reliable evidence absent here."), *aff'd sub nom., Cruzan v. Director, Mo. Dept. of Health, supra; In re Peter,* 108 N.J. 365, 529 A.2d 419, 425 (1987) (where decision is based on patient's wishes, proponent must present clear and convincing proof that, if competent, the patient would decline the treatment); *Conroy,* 486 A.2d at 1241 (requiring clear and convincing proof that patient will not regain decisional capacity); *Eichner,* 438 N.Y.S.2d 266, 420 N.E.2d at 72 (patient's intent, incompetence, and absence of chance of recovery); *Leach v. Akron Gen. Med. Ctr.,* 68 Ohio Misc. 1, 426 N.E.2d 809, 815 (Com.Pl.1980) ("because of the nature and importance of the issues involved, this court would be remiss if it did not adopt the highest possible civil standard of clear and convincing"), *superseded on other grounds by statute as stated by In re Guardianship of Myers,* 62 Ohio Misc.2d 763, 610 N.E.2d 663, 665–66, 670 (Com.Pl.1993) (abandoning substituted judgment test used in *Leach,* but requiring clear and convincing proof that patient is in a persistent vegetative state or permanently unconscious, and will not recover); *Colyer,* 660 P.2d at 751 (patient's condition). Only Pennsylvania and Wisconsin hold otherwise. *Fiori,* 652 A.2d at 1356–58; *L.W.,* 482 N.W.2d at 68.

We join the majority for the reason that "[w]hen evidence of a person's wishes or physical or mental condition is equivocal, it is best to err, if at all, in favor of preserving life." *Conroy,* 486 A.2d at 1233. Two jurisdictions have held that a valid living will constitutes clear and convincing evidence with respect to the patient's wishes. *Browning,* 568 So.2d at 16 ("[T]he pre-sumption of clear and convincing evidence that attaches to a written declaration does not attach to purely oral declarations."); *Saunders v. State,* 129 Misc.2d 45, 492 N.Y.S.2d 510, 517 (N.Y.Sup.Ct.1985) (living will is "evidence of the most persuasive quality and is a clear and convincing demonstration of" patient's wishes). *See also Martin,* 538 N.W.2d at 410 ("[A] written directive would provide the most concrete evidence of the patient's decisions . . . "). Since KRS 311.631 only applies where the patient has not issued an advance directive, we assume the General Assembly intended that a valid advance directive would be followed.

## VII. PUBLIC POLICY.

The guardian ad litem argues that KRS 311.631 violates the "public policy" embodied in the *DeGrella obiter dictum,* 858 S.W.2d at 702. Suffice it to say:

> [T]he establishment of public policy is not within the authority of the courts. . . . The establishment of public policy is granted to the legislature alone. It is beyond the power of a court to vitiate an act of the legislature on the grounds that public policy promulgated therein is contrary to what the court considers to be in the public interest. It is the prerogative of the legislature to declare that acts constitute a violation of public policy.

*Commonwealth ex rel. Cowan v. Wilkinson,* Ky., 828 S.W.2d 610, 614 (1992). *See also Reda Pump Co. v. Finck,* Ky., 713 S.W.2d 818, 821 (1986) ("[T]he establishment of public policy is the prerogative of the General Assembly."), *superseded by statute on other grounds as recognized by Caterpillar, Inc. v. Brock,* Ky., 915 S.W.2d 751, 753 (1996). As noted by the Court of Appeals of Maryland, "The question of whether to adopt a quality of life—best interest standard concerns our societal val-

ues in a most fundamental sense. The answer to that question is quintessentially legislative." *Mack*, 618 A.2d at 761. *See also Hamlin*, 689 P.2d at 1379 ("The problem before us involves social, moral and ethical considerations as well as complex legal and medical issues for which the legislative process is best suited to address in a comprehensive manner."

## VIII. ETHICAL STANDARDS.

Contrary to the assertion of the guardian ad litem, KRS 311.631 does not contravene any modern ethical standards, whether legal, medical, or moral. The National Center for State Courts identifies the following as generally accepted ethical standards with respect to life-sustaining medical treatment (LSMT) cases:

(1) There are no significant distinctions between withholding or withdrawing (stopping and not starting) LSMT.

(2) ... Regardless of the patient's condition, the overriding concerns for the health-care provider in the forgoing of LSMT are: (a) respecting patient autonomy (self-determination), and (b) improving patient well-being (the weighing of benefits and burdens of one plan of care in comparison with alternatives).

(3) Health care professionals have a duty to promote the welfare of their patients. However, this does not necessarily include the duty to preserve life at all costs. *Where LSMT fails to promote a patient's welfare, there is no longer an ethical obligation to provide it, and treatments no longer beneficial to the patient may be stopped.*

(4) LSMT can take many forms, from something as simple as a penicillin pill to something as complex as a respirator, depending upon the patient's circumstances. It is these circumstances that are important in making LSMT decisions and the potential to benefit the patient, and not labels such as "extraordinary," "ordinary," and "heroic," which are of little value in actually making the LSMT decision. Indeed, they tend to confuse the decision making.

(5) Artificial nutrition and hydration are forms of medical treatment; in general, their use or discontinuation should be governed by the same principles and practices that govern other forms of medical treatment. Although issues involving artificial nutrition and hydration are often presented more emotionally, from a moral and legal standpoint, they raise the same questions as do other forms of medical treatment.

(6) There are significant moral and legal distinctions between letting die (including the use of medications to relieve suffering during the dying process) and killing (assisted suicide/euthanasia). *In letting die, the cause of death is seen as the underlying disease process or trauma.* In assisted suicide/euthanasia, the cause of death is seen as the inherently lethal action itself.

Coordinating Council on Life-Sustaining Medical Treatment Decision Making by the Courts, *Guidelines for State Court Decision Making in Life-Sustaining Medical Treatment Cases* 143–45 (2d ed. rev. 1993) (emphasis added).

On March 15, 1986, The American Medical Association, through its Council on Ethical and Judicial Affairs, issued the following statement:

Withholding or Withdrawing Life Prolonging Medical Treatment.

The social commitment of the physician is to sustain life and relieve suffering. Where the performance of one duty con-

flicts with the other, the choice of the patient, or his family or legal representative if the patient is incompetent to act in his own behalf, should prevail. In the absence of the patient's choice or an authorized proxy, the physician must act in the best interest of the patient.

*For humane reasons, with informed consent, a physician may do what is medically necessary to alleviate severe pain, or cease or omit treatment to permit a terminally ill patient whose death is imminent to die.* However, he should not intentionally cause death. In deciding whether the administration of potentially life-prolonging medical treatment is in the best interest of the patient who is incompetent to act in his own behalf, the physician should determine what the possibility is for extending life under humane and comfortable conditions and what are the prior expressed wishes of the patient and attitudes of the family or those who have responsibility for the custody of the patient.

*Even if death is not imminent but a patient's coma is beyond doubt irreversible and there are adequate safeguards to confirm the accuracy of the diagnosis and with the concurrence of those who have responsibility for the care of the patient, it is not unethical to discontinue all means of life prolonging medical treatment.*

Life prolonging medical treatment includes medication and artificially or technologically supplied respiration, nutrition or hydration. In treating a terminally ill or irreversibly comatose patient, the physician should determine whether the benefits of treatment outweigh its burdens. At all times, the dignity of the patient should be maintained.

American Medical Association Council on Ethical and Judicial Affairs, Withholding or Withdrawing Life–Prolonging Medical Treatment (March 15, 1986) (emphasis added), *quoted in Rasmussen,* 741 P.2d at 684.

There is a dearth of written authority on this issue from the viewpoint of religious ethicists, perhaps because resuscitation, itself, is a relatively recent medical advancement. The authority that exists has emanated primarily from sources associated with the Roman Catholic Church. Pope Pius XII discussed the moralities of both accepting resuscitation and terminating it:

> The technique of resuscitation which concerns us here does not contain anything immoral in itself. Therefore the patient, if he were capable of making a personal decision could lawfully use it and, consequently give the doctor permission to use it. On the other hand, since these forms of treatment go beyond the ordinary means to which one is bound, it cannot be held that there is an obligation to use them nor, consequently, that one is bound to give the doctor permission to use them.
>
> . . .
>
> Consequently, if it appears that the attempt at resuscitation constitutes in reality such a burden for the family that one cannot in all conscience impose it upon them, they can lawfully insist that the doctor should discontinue these attempts, and the doctor can lawfully comply. There is not involved here a case of direct disposal of the life of the patient, nor of euthanasia in any way: this would never be licit. Even when it causes the arrest of circulation, the interruption of attempts at resuscitation is never more than an indirect cause of the cessation of life, and one must apply in this case the principle of double effect.[13]

---

**13.** The "principle of double effect" assumes that an action is likely to have two effects—

Pope Pius XII, The Prolongation of Life, An Address to an International Congress of Anesthesiologists, (Nov. 24, 1957), *in* 4 *The Pope Speaks Magazine* 393, 397 (1958).

On May 5, 1980, the Vatican, with the approval of Pope John Paul II, published its "Declaration on Euthanasia" which states as follows with respect to the "right to die":

Today it is very important to protect, at the moment of death, both the dignity of the human person and the Christian concept of life, against a technological attitude that threatens to become an abuse. Thus some people speak of a "right to die," which is an expression that does not mean the right to procure death either by one's own hand or by means of someone else, as one pleases, *but rather the right to die peacefully with human and Christian dignity.* From this point of view, the use of therapeutic means can sometimes pose problems.

In numerous cases, the complexity of the situation can be such as to cause doubts about the way ethical principles should be applied. In the final analysis, it pertains to the conscience either of the sick person, *or of those qualified to speak in the sick person's name,* or of the doctors, to decide, in the light of moral obligations and of the various aspects of the case.

. . .

If there are no other sufficient remedies, it is permitted, with the patient's consent, to have recourse to the means provided by the most advanced medical techniques, even if these means are still at the experimental stage and are not without a certain risk. By accepting them, the patient can even show generosity in the service of humanity.

*It is also permitted, with the patient's consent, to interrupt these means, where the results fall short of expectations.* But for such a decision to be made, account will have to be taken of the reasonable wishes of the patient and the patient's family, as also of the advice of the doctors who are specially competent in the matter. The latter may in particular judge that the investment in instruments and personnel is disproportionate to the results foreseen; they may also judge that the techniques applied impose on the patient strain or suffering out of proportion with the benefits which he or she may gain from such techniques.

It is also permissible to make do with the normal means that medicine can offer. *Therefore, one cannot impose on anyone the obligation to have recourse to a technique which is already in use but which carries a risk or is burdensome.* Such a refusal is not the equivalent of suicide; on the contrary, it should be considered as an acceptance of the human condition, or a wish to avoid the application of a medical procedure disproportionate to the results that can be expected, or a desire not to impose excessive expense on the family or the community.

When inevitable death is imminent in spite of the means used, *it is permitted in conscience to take the decision to refuse forms of treatment that would*

---

one good and one bad. The action may be taken if (1) the act, itself, is good, or at least neutral; (2) the actor's intent is good, not bad; (3) the good effect precedes, or at least occurs simultaneously with, the bad; and (4) a proportionately grave reason justifies the act. *See* Pravin Thevathasan, *Moral Absolutes and the Principle of Double Effect,* Cath. Med. Q. (Nov.2003), http://www.catholicdoctors.org.uk/ CMQ/Nov._2003/ moral_absolutes_double_effect.htm.

*only secure a precarious and burdensome prolongation of life,* so long as the normal care due to the sick person in similar cases is not interrupted. In such circumstances the doctor has no reason to reproach himself with failing to help the person in danger.

Sacred Congregation for the Doctrine of the Faith, Declaration on Euthanasia (1980), http://www.vatican.va/ roman_curia/congregations/cfaith/ documents/rc_con_cfaith_doc_19800505_euthanasia_en.html (emphasis added). *See also* Joseph Cardinal Bernardin, The Consistent Ethic of Life: The Challenge and the Witness of Catholic Health Care, Address at the Catholic Medical Center, Jamaica, N.Y. (May 18, 1986) ("[T]here is no obligation, in regard to care of the terminally ill, to initiate or continue extraordinary medical treatments which would be ineffective in prolonging life or which, despite their effectiveness in that regard, would impose excessive burdens on the patient."). These authorities are consistent with the Judeo–Christian–Muslim belief that there is an afterlife more desirable than the earthly one. To those who espouse that belief, it may seem more egregious to delay a natural death and the beginning of eternal life than to needlessly prolong an unnatural, artificially-maintained existence on earth.

From these authorities, we conclude that KRS 311.631 does not contravene modern legal, medical, or moral ethical standards.

## IX. JUDICIAL OVERSIGHT.

Of the approximately 2 million people who die each year, 80% die in hospitals and long-term care institutions, and perhaps 70% of those after a decision to forgo life-sustaining treatment has been made.

*Cruzan,* 497 U.S. at 302–03, 110 S.Ct. at 2864 (Brennan, J., dissenting) (citing President's Commission, at 15 n. 1, 17–18, and Helene L. Lipton, *Do–Not–Resuscitate Decisions in a Community Hospital: Incidence, Implications and Outcomes,* 256 JAMA 1164, 1168 (1986)).

Thus, it would be logistically impossible to require court approval of every decision to withhold or withdraw life-prolonging treatment. Furthermore, "[j]udicial intervention into private decision-making of this sort is expensive and intrusive." *DeGrella,* 858 S.W.2d at 710. It is both impossibly cumbersome and "a gratuitous encroachment upon the medical profession's field of competence." *Quinlan,* 355 A.2d at 669. Thus, unless the interested parties disagree, resort to the courts is unwarranted. *Rasmussen,* 741 P.2d at 691 ("[The court's] encroachment into the substantive decisions concerning medical treatment should be limited to resolving disputes among the patient's family, the attending physicians, an independent physician, the health care facility, the guardian, and the guardian ad litem."); *Drabick,* 245 Cal.Rptr. at 850–51 (construing statute as permitting guardian to give consent without judicial approval); *In re L.H.R.,* 253 Ga. 439, 321 S.E.2d 716, 723 (1984), *superseded by statute on other grounds as recognized by In re Doe,* 262 Ga. 389, 418 S.E.2d 3, 6 (1992); *In re Lawrance,* 579 N.E.2d 32, 41–42 (Ind.1991) (health care decisions should be left to "patients, their families, and their physicians;" where none of the interested participants disagree, court action is unnecessary); *Jobes,* 529 A.2d at 451 ("Courts are not the proper place to resolve the agonizing personal problems that underlie these issues. Our legal system cannot replace the more intimate struggle that must be borne by the patient, those caring for the patient, and those who care about the patient."); *Fiori,* 652 A.2d at 1356 ("[T]here is no need for a court to intervene in this decisionmaking

process unless there is disagreement between the interested parties, who are usually identified as the medical professionals involved in treating and evaluating the patient and the patient's family or guardian."); *Hamlin*, 689 P.2d at 1378 ("[I]f the treating physicians, the prognosis committee, and the guardian are all in agreement that the incompetent patient's best interests are served by termination of life sustaining treatment, absent legislation to the contrary, there is no need for judicial involvement in this decision."); *L.W.*, 482 N.W.2d at 75 (court approval required only where there is a disagreement with the guardian's decision). The President's Commission agreed. "[D]ecisionmaking about life-sustaining care is rarely improved by resort to courts." President's Commission, at 247. Neither the cases nor KRS 311.631 draw a distinction in this regard between situations where the guardian is a member of the patient's family and situations involving institutional or governmental guardians.

 Nor is it necessary to obtain the appointment of a guardian where there is no disagreement with respect to the appropriate treatment. "If all parties, the immediate family, the treating physicians and the prognosis committee [if there is one], agree as to the course of treatment, a guardian is not necessary." *Hamlin*, 689 P.2d at 1377.

## X. CONCLUSION.

To summarize, when an incompetent patient has not executed a valid living will or designated a health care surrogate, KRS 311.631 permits a surrogate, designated in order of priority, to make health care decisions on the patient's behalf, including the withholding or withdrawal of life-prolonging treatment from a patient who is permanently unconscious or in a persistent vegetative state, or when inevitable death is expected by reasonable medical judgment within a few days. The statute requires that such decisions be made in good faith and in the best interest of the patient. In that regard, the statute is not unconstitutional and does not contravene public policy or modern ethical standards. If there is no guardian and the physicians, family, and ethics committee (if there is one) all agree with the surrogate's decision, there is no need to appoint a guardian. If the surrogate, as here, is a judicially-appointed guardian, and the physicians, family and ethics committee agree with the guardian's decision, there is no need to seek court approval or the appointment of a guardian ad litem; and that is true whether the guardian is a member of the patient's family or an institution or, as here, a governmental entity. If there is a disagreement, however, resort may be had to the courts; and, if so, the burden will be upon those seeking to withhold or withdraw life support from the patient to prove by clear and convincing evidence that the patient is permanently unconscious or in a persistent vegetative state, or that death is imminent, and that it would be in the best interest of the patient to withhold or withdraw life-prolonging treatment.

In determining the patient's best interest, courts may consider, but are not limited to considering: (1) the patient's present level of physical, sensory, emotional, and cognitive functioning and the possibility of improvement thereof; (2) any relevant statements or expressions made by the patient, when competent, as to his or her own wishes with a rebuttable presumption attaching to a valid living will or a designation of a health care surrogate; (3) to the extent known, the patient's own philosophical, religious, and moral views, life goals, values about the purpose of life and the way it should be lived, and attitudes toward sickness, medical procedures, suffer-

ing and death; (4) the degree of physical pain caused by the patient's condition, treatment, and termination of treatment; (5) the degree of humiliation, dependence, and loss of dignity probably resulting from the condition or treatment; (6) the life expectancy and prognosis for recovery with and without the treatment; (7) the various treatment options and their risks, benefits, and side effects; (8) whether any particular treatment would be proportionate or disproportionate in terms of the benefits gained; and (9) the impact on the patient's family (the assumption being that the patient would be concerned about the well-being and happiness of his or her own family members).

Accordingly, the decision of the Court of Appeals is affirmed in part and reversed in part. Because Matthew Woods is now deceased, remand is unnecessary.

LAMBERT, C.J.; JOHNSTONE, and KELLER, JJ., concur.

GRAVES, J., concurs by separate opinion.

WINTERSHEIMER, J., dissents by separate opinion.

STUMBO, J., dissents without separate opinion for the reasons set forth in Parts I through IV of the dissenting opinion of WINTERSHEIMER, J.

Justice GRAVES, concurring.

I concur and write separately because KRS 446.400 is outdated and does not give sufficient guidance to accurately determine when death meaningfully occurs. "The concept of brain death has long been recognized, however, to be plagued with serious inconsistencies and contradictions. Indeed, the concept fails to correspond to any coherent biological or philosophical understanding of death." Robert D. Truog, M.D., F.C.C.M. and Walter M. Robinson, M.D., M.P.H., "Role of Brain Death and the Dead–Donor Rule in the Ethics of Organ Transplantation," *Critical Care Medicine,* 2003 Vol. 31, No. 9, p. 2391.

Justice WINTERSHEIMER, dissenting.

I must respectfully and completely dissent from the majority opinion. It is deeply disappointing that this Court would decide to allow an agency of this State to end the life of a totally innocent ward of that very same State. It is even more shameful to realize that the State would seek to terminate the innocent human life of a person entrusted to its care and protection. Equally disturbing is the role of the hospital and the ethics committee charged with the care and comfort of the patient in actively participating in this deplorable situation.

The lengthy majority opinion is fatally flawed in that it recites incomplete facts, misinterprets previous cases, and seeks moral justification from outdated sources. It requires a detailed and comprehensive response.

The major concern here is whether the Kentucky Living Will Directive Act, KRS 311.621 to KRS 311.643, is applicable and allows the Commonwealth of Kentucky, as a guardian, to authorize the withdrawal of life-sustaining medical treatment from a lifelong incompetent ward of the State.

This case involves the decision to end the life of a person, a ward of this state with mild to moderate mental retardation, although he committed no crime and did not seek this judgment from the court. It is estimated that there are more than 2500 people in Kentucky who have state guardians. Some have mental retardation and others have mental illness. Such individuals are particularly helpless and vulnerable and thus deprived of the opportunity to make choices for themselves. Certainly, it

is generally understood that there is a necessity to protect individuals with substantial mental disabilities from the adverse consequences of potentially unwise, ill-informed or incompetently made decisions. *See* James W. Ellis, *Decisions by and for People with Mental Retardation: Balancing Considerations of Autmomy and Protection*, 37 Villanova L.Rev. 1779 (1992). This includes a person's inalienable right to life as articulated in the United States Declaration of Independence and guaranteed by the Kentucky Constitution § 1, as set out in *DeGrella v. Elston*, Ky., 858 S.W.2d 698 (1993). Kentucky law requires that guardians assure that the personal, civil and human rights of the ward are protected. KRS Chapter 387 and *DeGrella, supra,* should govern the decision of a guardian to withdraw or withhold treatment under KRS 311.629 and KRS 311.631.

Woods was a 54 year old, mildly retarded man, who had been a ward of the state since he was 18 years old. The evidence indicates that he had an I.Q. of 71 and the intellectual capacity of an 8 to 10 year old child.

Woods apparently lived a full life in a family care home. It is entirely likely that he had friends in the home and knew professionals who worked with him fairly well. He had a girlfriend. He went to an adult day treatment program three days a week. He attended church and was comfortable traveling across town by bus to visit his friends. His guardian provided him with limited medical and financial decision-making assistance and Woods was capable of taking care of his personal needs. He had always been very friendly and frequently greeted total strangers with enthusiasm and exuberance. He was outgoing, polite, liked to dress up and occasionally smoked a cigarette. In 1995, while en route to the University of Kentucky Medical Center for a routine asthma treatment, he suffered a serious heart attack.

In 1991, a district court jury found Woods partially disabled in managing his personal affairs and financial resources pursuant to KRS 387.500 et seq. Consequently, the district court appointed the Commonwealth as a limited guardian for Woods. The district court order deprived Woods of his right to dispose of property; to execute instruments; to enter into contracts; to determine living arrangements; to consent to medical procedures; to obtain an automobile driver's license; and to manage his financial affairs. The Commonwealth, as limited guardian, had the responsibility and the authority to exercise such rights for Woods.

It should be clear that Woods was considered pursuant to appropriate civil action not to be of sound mind before he fell into an unconscious state and was placed on a mechanical ventilator. As noted by the Court of Appeals and the circuit court, Woods probably never had the capacity to decide whether he would have wanted life-supporting measures discontinued if he ever required such measures. He had not prepared any advance directive or living will, nor was he ever capable of doing so.

The circuit court should not have applied the Living Will Directive Act. As a Court of final review, we are not required to adopt the decisions of the trial court as to a matter of law, but must interpret the statutes according to the plain meaning of the act and in accordance with the legislative intent. *Floyd County Bd. of Ed. v. Ratliff,* Ky., 955 S.W.2d 921 (1997). It is clear from a plain reading of the Living Will Directive Act that the General Assembly did not intend that it would apply to someone like Matthew Woods because the Act only applies to adults who are at least 18 years old and of sound mind.

The Act focuses on two time periods: 1) Before the adult patient loses decisional capacity and 2) After the adult patient loses such capacity. The Act does not address the situation of a person who has been a life-long incompetent. Such a person could never have made an advance directive because he was never of sound mind prior to the time in which he lost his decisional capacity to make and communicate health care decisions.

The proper approach was set out in the statutes relating to guardianship and conservatorship for disabled persons in Chapter 387 and as interpreted consistent with *DeGrella.* If such criteria had been used, the Commonwealth would have had no basis on which to request the removal of life-supporting treatment from the patient.

The principal issue in *DeGrella* was whether the trial court could lawfully approve the right of a legal guardian to authorize the termination of artificial nutrition and hydration of an incompetent person when that person, while competent, had expressed her wishes that life-supporting measures be discontinued. Although a majority of this Court upheld the decision to withdraw nutrition and hydration from DeGrella, the majority made it clear that it would not permit the withdrawal of life-support from an incompetent person where the wishes of that person were unknown. In fact, *DeGrella* established that the withdrawal of life-supporting measures violated the inalienable right to life of a patient if such withdrawal were not based on the clearly expressed wishes of the patient.

The clear and unambiguous language of the Act required an adult patient to be at least 18 years of age and of sound mind in regard to a civil matter. KRS 311.621(1).

Woods had previously been deprived of his right, among other things, to consent to medical procedures by the district court in 1991. The Living Will Directive Act provides that, "If an adult patient, who does not have decisional capacity, has not executed an advance directive or to the extent the advance directive does not address a decision that must be made, ... [certain specified individuals] shall be authorized to make health care decisions on behalf of the patient." KRS 311.631(1).

## II. Guardianship Statutes

There is always the possibility that this situation will arise again, and some guidance should be available to individuals and organizations that are confronted with this or a similar situation. It is respectfully suggested that the statutes relating to guardianship and conservatorship for disabled persons, Chapter 386 et. seq., should be invoked.

Pursuant to KRS 387.640, a limited guardian or guardian, has the general duty to carry out diligently and in good faith the specific duties and powers assigned by the Court and, in part, to assure that the personal, civil and human rights of the ward are protected. Although specific duties can be modified by court order, a limited guardian must follow KRS 387.660(2), (3) and (4) as follows:

(2) To make provision for the ward's care, comfort, and maintenance and arrange for such educational, social, vocational, and rehabilitation services as are appropriate and as will assist the ward in the development of maximum self-reliance and independence.

(3) To give any necessary consent or approval to enable the ward to receive medical or other professional care, counsel, treatment or service, except that a guardian may not consent on behalf of a ward to an abortion, sterilization, psychosurgery, removal of a bodily organ, or amputation of a limb unless the pro-

cedure is first approved by order of the court or is necessary, in an emergency situation, to preserve the life or prevent serious impairment of the physical health of the ward.

(4) To act with respect to the ward in a manner which limits the deprivation of civil rights and restricts his personal freedom only to the extent necessary to provide needed care and services to him.

These statutes do not mention the withdrawal of life-support systems. In *DeGrella*, this Court considered the guardianship statutes as remedial and not exclusive, stating that those statutes intend to provide services for incompetent persons, not only as specifically articulated, but also as reasonably inferable from the nature of the powers of the guardian.

The rationale of the court relied in large measure on *Rasmussen by Mitchell v. Fleming*, 154 Ariz. 207, 741 P.2d 674 (1987). This Court approved the statement in *Rasmussen, supra*, that the court will presume the patient wishes to continue to receive medical treatment and the party wishing to discontinue that treatment bears the burden to prove to the contrary. *See DeGrella*, 858 S.W.2d at 705. This Court considered the term "best interest" of the ward solely from the standpoint of the health and well being of the ward and synonymous with the decision the ward would have chosen if conscious and competent to do so. However, this Court made it clear when it stated, "We do not go to the next step, as the Arizona court did in the *Rasmussen* case to decide that 'best interest' can extend to terminating life-sustaining medical treatment where the wishes of the ward are unknown." *Id.*

Consequently, although the majority of the *DeGrella* court determined that the statutes related to guardianship and conservatorship for disabled persons were re-

medial and intended to provide services for incompetent persons as reasonably inferable from the nature of the guardian's power, the majority refused to allow a guardian to withdraw life support measures from an incompetent ward where the wishes of the ward were unknown. The *DeGrella* opinion recognized that the rights of self-determination and informed consent in obtaining and withholding medical treatment can be exercised by an incompetent through the process of surrogate decision-making *so long as the wishes of the patient were known.*

Thus, under *DeGrella* and the guardianship statutes of this Commonwealth, the decision to withhold life support systems from Woods was improper. Such a decision could only have been made if his wishes were known, which they were not. As stated in *DeGrella*, "we do not approve permitting anyone to decide when another should die on any basis other than clear and convincing evidence that the patient would chose to do so." 858 S.W.2d at 702.

The *DeGrella* opinion states that "as long as the case is confined to substitute decision-making by a surrogate *in conformity with the patient's previously expressed wishes, the case involves only the right to self-determination and not the quality of life.*" *DeGrella*, 858 S.W.2d at 702 (emphasis added). Our court noted that when the withdrawal of life support becomes solely another person's decision about that patient's quality of life, which reasonably would occur when the patient's wishes are unknown, the patient's inalienable right to life outweighs any consideration of the quality or value of the life involved.

Pursuant to KRS 387.640(1) and KRS 387.660(4), any decision favoring the removal of life support systems based solely on the quality of life is inherently invalid, particularly where as in this case, the

views of the ward on the subject of life support are unknown. It is fundamental that guardians are charged with the protection of the civil and human rights of their wards.

There is significance in the fact that KRS 387.660(3) requires that in nonlife-threatening circumstances, court approval is necessary before a guardian may consent on the behalf of a ward to an abortion, sterilization, psychosurgery, removal of a bodily organ or amputation of a limb. It would appear by analogy that from such a requirement, the legislature intended to protect all wards from those guardians who did not have their "best interest" at heart. At a minimum, it would appear that a life-long incompetent ward should receive the same level of protection from harm. Therefore, it is logically inconceivable that a guardian would seek to end the life of his ward.

### III. Court of Appeals Error

The Court of Appeals erred in determining that the 1994 amendments to KRS 311.621–311.643, the Kentucky Living Will Directive Act, superseded the guidelines of this Court in *DeGrella*. The statutes in question were not a legislative response to *DeGrella*, but rather a departure from any reasonable application of that case. Although there are significant factual differences, it is clear that the *DeGrella* majority contemplated the situation involving Woods and other individuals similarly situated. *DeGrella* gave clear direction to those who would be involved in future decisions involving the right to nutrition and hydration to the effect that the right to live should be respected and upheld in the absence of clear and convincing evidence as to what the individual would choose to do.

The opinion states in part:

At the point where the withdrawal of life-prolonging medical treatment becomes solely another person's decision about the patient's quality of life, the individual's "inalienable right to life," as so declared in the United States Declaration of Independence and protected by Section One (1) of our Kentucky Constitution, outweighs any consideration of the quality of the life, or the value of the life, at stake. Nothing in this Opinion should be construed as sanctioning or supporting euthanasia, or mercy killing. We do not approve permitting anyone to decide when another person should die on any basis other than clear and convincing evidence that the patient would choose to do so.

*DeGrella*, 858 S.W.2d at 702.

Here, there was no evidence presented as to the intent of Woods to his preference for the withdrawal of life-sustaining treatment. Every witness testified that they did not know his intentions and there was no record of his intentions. In *DeGrella*, the patient had made her medical desires known prior to becoming incompetent. Woods was never competent enough to make such a choice. He was entitled to the protection of the State or of his duly appointed guardian to protect his right to live. He was extremely vulnerable, unprotected against any termination of his medical treatment. Any deprivation of life is subject to strict scrutiny. *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) *overruled on other grounds by Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). Any state action in interfering with a fundamental right is subject to strict scrutiny. *See City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

When the decision is between life and death, and the state is involved, the decision maker is limited to those options conforming to the constitutional preference for life over death. In civil matters, life must be chosen. Incompetent individuals retain a right to life pursuant to the Fourteenth Amendment to the United States Constitution and Sections One and Two of the Kentucky Constitution. *Cf. DeGrella.*

## IV. Best Interest Test

The Court of Appeals erred when it adopted the "best interest" test announced in *Rasmussen.* The Court of Appeals was mistaken when it held that KRS 311.631 authorized a guardian to exercise "substitute decision-making" for an incompetent person based on the best interest standard. Such a conclusion was considered and clearly explained in *DeGrella* to the effect that the best interests was to be viewed exclusively from the standpoint of the health and well-being of the ward and synonymous with the decision the ward would choose to make if conscious and competent to do so. As noted in *DeGrella*:

> We do not go to the next step, as the Arizona court did in the *Rasmussen* case, to decide that "best interest" can extend to terminating life-sustaining medical treatment where the wishes of the ward are unknown.

858 S.W.2d at 705.

The Court of Appeals does not define what it means by "best interest" and thus opens the door to any subjective interpretation of such a standard. The majority of this Court recognized in *DeGrella* that using substituted judgment that incorporates a quality of life assessment creates a very dangerous situation which can involve the application of subjective values in determining a minimum that can be accepted as a quality life. The right to live is a natural and fundamental right. It arises automatically and not as a result of any personal surrogate or governmental choice.

In applying the strict scrutiny test, we find that the state can make no showing that its interests outweigh the private interests of the individual as guaranteed by the federal and state constitutions. The state, through its agents, must prove that a governmental interest in the nontreatment of a patient overrides the interest in life of the patient. Such a burden was not satisfied in this case and could not be satisfied in any case involving a ward of the state.

The State attempted to present evidence that providing life-sustaining measures to Woods denied him a "meaningful life," was "inhumane," "futile," "not in his best interest," and "abusive." Such beliefs amount to a personal subjective judgment by state bureaucrats about the quality of life of the ward. The State should not be allowed to determine the quality of life question.

The public policy of Kentucky as expressed in Chapter 387 is to consider the wishes of the ward in the manner expressed by him and to involve the ward in decision-making to the greatest extent possible.

Decisions under KRS 311.629 and KRS 311.631 may be irreversible, but all such decisions should err on the side of caution, if at all. Here, although the trial judge found Woods to be "permanently unconscious" as defined by law, the guardian ad litem indicated that Woods began to improve dramatically the evening of the trial. There is some medical evidence that Woods was actually no longer in a persistent vegetative state but was recovering from anoxic encephalopathy.

> The function of legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions.

Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend on the need to serve the purpose of minimizing the risk of error.

*Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1 at 13, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

## V. Errors in the Majority Standard

The lengthy analysis of the majority opinion seemingly ignores the relatively recent, dispositive and contrary holding of this Court in *DeGrella.* The majority opinion attempts to hoist itself into intellectual integrity and judicial consistency with *DeGrella* by asserting that "DeGrella did not require us to reach the 'best interests' analysis as the case could be decided on the basis of substituted judgment."

Actually, intellectual honesty compels the recognition that *DeGrella* specifically rejected the "substituted judgment test" now embraced by this majority and improperly attributed to *DeGrella.* In fact, *DeGrella* made clear:

We do not approve permitting anyone to decide when another should die on any basis other than clear and convincing evidence that the patient would chose to do so ...

858 S.W.2d at 702. *DeGrella* also stated:

There is one prefatory issue which we must address before embarking on this discussion lest our words be misunderstood as the first step onto a slippery slope, or misapplied by trial courts in future cases: that is the quality of life issue. As long as the case is confined to substituted decision making by a surrogate in conformity with the patient's previously expressed wishes, the case

involves only the right of self-determination and not the quality of life.

*Id.*

The majority opinion ignores the fact that the district court order deprived Woods of the following rights: to dispose of property, to execute instruments, to enter into contractual relationships, to determine living arrangements, to consent to medical procedures, to obtain a motor vehicle operator's license, and to manage his own financial affairs.

The majority attempts to persuade that Woods would nonetheless be within the purview of the Kentucky Living Will Act, citing a variety of inapplicable cases that hold that a person can make a testamentary will even if he does not have the requisite mental capacity to transact business, generally. The opinion ignores the crucial distinction between the jealous protection by the law of every testator's right to dispose of his property as he sees fit on the one hand, and the necessity for the law to protect the sanctity of innocent human life on the other hand. "Life" issues are certainly not disposed of appropriately by cases dealing with "property" issues.

The legislative intent that the act should apply only to adults who are at least 18 years of age and who are of sound mind patently excludes such persons as Woods who had been a ward of the state since his 18th birthday, had a mental age of 8 or 9 years and had never been shown to be of sound mind or testamentary capacity. Even testamentary wills disposing of property cannot be made unless a person is 18 years of age and of sound mind, much less decisions regarding the furnishing of food and water and essential medical care.

## A. "Permanently Unconscious" is a Fallacy

One of the most disturbing aspects of the majority opinion is the subtle reliance

on the statutory term "Permanently Unconscious" as defined in KRS 311.621(12), *supra*, maj. op., at note 1. That term has medical meaning but the common import is senseless because it infers irreversibility to the unconscious state. The illogic of the import is that it implies a certainty that the person labeled such will never recover. In this sense, the only person permanently unconscious is one that is already dead. Using the label however, makes the person attempting to govern the life or death of another moderately more likely to assume that recovery is impossible and thereby order the death of another when the likelihood of consciousness is not adequately ascertainable or if the likelihood becomes difficult to predict.

Perhaps the most chilling aspect of this case is that the treating physicians had arrived at the conclusion that Woods had reached a state of permanent unconsciousness in order to recommend withdrawal of life support. Such a recommendation had been made on the belief that he was permanently unconscious, however, Woods had later shown a recovery strong enough to cause one doctor to retract his previous recommendation.

### 1. Medicinally–Induced Permanent Unconsciousness?

It is even more serious to realize that the lack of improvement in Woods' condition may have been the result of his being medicated by a paralyzing drug. Ostensibly for the purpose of diminishing an occasional jerking motion, Woods had been placed on a medication designed to paralyze his movements. Such medication is at least likely to be the cause of "permanent unconsciousness". In a motion to the court filed June 23, 1995, Dr. Suhl was noted to report that the administration of the paralyzing drug had been stopped on the date of the hearing. In addition to saying, "his myoclonus (twitching/spasms)

improved," he noted that, in the next couple days: it became apparent that Woods was able to open his eyes and look at him when he was awakened; Woods appeared to show pain when he was struck with an intravenous needle; and, through neurological analysis by Dr. Robertson, Woods was no longer in a Persistent Vegetative State. In other words, when the paralyzing drug had been stopped Woods's condition improved.

Restarting the medication placed Woods back in a state of perceived unconsciousness. In a letter dated June 2, 1995, Dr. Robertson had re-evaluated Woods and drawn the conclusion that Woods's recovery was temporary because the response to external stimuli had dropped. However, he also noted that the myoclonic jerks had diminished as "perhaps the result of medication". Medication made for the purpose of paralyzing seems likely to produce a coma-like state. There was no indication in Dr. Robertson's letter that the downward turn in Woods's condition was not the exclusive result of medication.

Woods became awakened and showed signs of pain when the paralyzing drug was removed. According to Webster's New Collegiate Dictionary, Awake means "1: to cease sleeping 2: to become aroused or active again 3: *to become conscious* or aware or aware of something." The only fair inference from evidence that he could be awakened is that Woods was no longer permanently unconscious. The majority opinion has a different interpretation of this evidence, but that's a difference of opinion, not a matter of accuracy as it suggests. Therefore, it is unclear as to the extent to which the paralyzing drug administered to Woods had on contributing to his appearance of "permanent unconsciousness," nor is it clear that the paralyzing drug did not hinder his recovery. Dr. Hurst, who treated Woods at St.

Joseph Hospital, had ordered withdrawal of food, water, and ventilation because of certain seizures Woods experienced. It should be noted that the majority opinion cites part of the impassioned plea made by Dr. Hurst, "Frankly, I do not see much difference between what we are doing here and some of the atrocities that we read about in Bosnia". The remarks by Dr. Hurst could be subject to various interpretations as he offered no further explanation. However, it can be reasonably inferred that the true atrocity is the termination of Woods's life.

Because of the improvements and the potential for recovery, Dr. Suhl had retracted his earlier recommendation of withdrawing mechanical ventilation and specifically recommended "continuation of artificially provided nutrition and hydration and all care needed for his comfort and hygiene." Such life-sustaining "treatments", i.e. food, water, and air, are necessary for every person to live, including those who are conscious. Dr. Suhl still recommended a lesser standard for resuscitation, meaning no longer providing life-prolonging treatments such as resuscitation or surgeries. However, the key is that Dr. Suhl separated food, water, and air from other types of medical treatments.

Despite Dr. Suhl's retraction and Woods's potential recovery, the majority opinion conveniently ignores this evidence and asserts that the eleven members (including four physicians) of the hospital ethics committee unanimously agreed with the recommendation.

**B. "Medical Treatments" is Too Broad and Without Distinction Would Give Prisoners More Rights Than a Sick Person.**

Among the several types of care available, three categories are apparent: 1) basic hydration, nutrition, and ventilation; 2) medicine; and, 3) procedures. When we speak of withholding medical treatment from a ward, or any person, we must specify what we mean. Food, water, and air are basic to life. Without any of these three things, any person, conscious or not, will die. Therefore, it can be said that every person is in a state of *mors interruptus* (death interrupted) save for food, water, and air. Death is interrupted by the supply of these things. The interposition of latin, however, makes the term seem more frightening and therefore makes the decision to remove the medical treatments seem acceptable. The terms we are using to describe the true actions are masking reality: removing food, water and air from a living person is an atrocity. Change the words to "removing life-prolonging treatment from a person who is permanently unconscious" and it all sounds nice and easy to swallow. Care must be taken then to prohibit the language of our standard from masking atrocity.

Many of the considerations on whether to withdraw food, water, and ventilation are made on poor judgments concerning the probability of the patient's recovery from an unconscious state. Although at one time it looked unlikely that Woods could become conscious again and three doctors thought Woods should be taken from the ventilator and thereby die, he made a recovery once he was taken off of the paralyzing drug. Notwithstanding that Woods had been labeled "permanently unconscious," Dr. Suhl reported that Woods did recover during a period of time concurrent with the removal of the paralyzing drug. Once the paralyzing drug was administered to him again, Woods went back into the coma-like conditions. Such recovery, had it been permitted to continue without intervention of the paralyzing drug, may have later included breathing without the machine ventilator.

An overbroad standard that by its loose language includes food, water, and air under the label of "medical treatment" will permit the withdrawal of these basic necessities by the guise of "removing life-prolonging medical treatment". Nowhere else is the restriction of food, water, or air permitted by the State from a person under its care, including prisoners, which are to be furnished with food at least "sufficient to sustain normal health". *See Cunningham v. Jones,* 667 F.2d 565 (6th Cir. (Ky.) 1982). Other necessities are required to be furnished as well. Starving, dehydrating, or suffocating a prisoner is therefore impermissible, as well as it ought to be for any other person under State care, including wards requiring medical treatment through prolonged care.

Allowing substituted judgment or best interest standards to animate decisions regarding withdrawal of basic life necessities places the ward in a position worse than a prisoner. Regarding food, water, and air, the only standard is for the ward to demand their supply at all times because it is necessary to all life. Prisoners are not even able to make a choice to refuse to eat because the State will force-feed them to preserve their health. *See,* e.g., *Martinez v. Turner,* 977 F.2d 421 (8th Cir.1992) (rejecting constitutional challenge to decision by prison officials to force-feed an inmate on hunger strike). However, the majority opinion will allow a ward to be denied food.

Types of medical treatment beyond basic necessity, such as surgeries, medicine, and invasive procedures, should be treated differently than ordinary or basic care. The prison cases place these types of treatment under different balancing than provision of necessity. *See,* e.g., *McCormick v. Stalder,* 105 F.3d 1059 (5th Cir. 1997) (due process did not prevent forced medical treatment of prisoner with tuber-culosis because of danger to other prisoners); *see also Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (due process did not prevent forced medication of mentally-ill prisoner to prevent harm to himself or others). Those cases use a balancing standard, but the hunger strike case did not because food, water, and air are a basic necessity. A prisoner has the ability to refuse some medical treatments, however. *See Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (prisoners may refuse some unwanted medical treatments as unnecessary and wanton infliction of pain in violation of the Eighth Amendment); *see also Noble v. Schmitt,* 87 F.3d 157 (6th Cir.1996).

The bottom line is that while a prisoner may refuse certain treatments, he or she cannot refuse necessities of life and the State must provide those necessities, even forcibly if necessary.

In the case of a ward being medically treated and under the care of a guardian ad litem, the standard ought to be that food, water, and air or mechanical ventilation may never be removed—the State must provide them until death because these are life-sustaining necessities and not merely medical treatment. Using the standard proposed by the majority will reduce the rights of a sick innocent person to something less than we give prisoners.

## C. Characterizations of Medical Care

The majority opinion seeks moral justification by citing outdated comments by Pope Pius XII (1939–1958) from an earlier time when the philosophy of death was not so prevalent. The recent pronouncements of Pope John Paul II built upon those of Pope Pius XII and are more in concert with traditional moral philosophy.

Specifically, the majority opinion fails to make a common distinction in care. The best interest standard, as presented by the

majority opinion, can easily be abused in the future because it does not differentiate between ordinary care and extraordinary care. By failing to safeguard basic care as mandatory, the standard would allow the withdrawal of these items under a quality of life determination. Although it cites some moral sources, it fails to properly conform the best interest standard to the limited type of care for which it is meant to be applied. Moral commentators tend to divide medical care into two categories: ordinary and extraordinary care. *See,* e.g., Rev. Michael P. Orsi, *Catholic Thinking on End of Life Decisions* (Pauline Books & Media 2000). Ordinary care is the proportionate means of preserving life. Ordinary care includes basic care, which is the provision of food and water, whether by artificial means or naturally, hygiene, and comfort. Extraordinary care includes surgical procedures and other types of care not generally associated with basic life support. Ordinary care may never be withdrawn from a living person. *See,* e.g. *Orsi, supra.*

Extraordinary care is best suited to the standard adopted by the majority because it balances the many aspects of the decision, such as the proportionality of the care to the situation. A person needing extraordinary care may, when death is clearly imminent and inevitable, "refuse forms of treatment that would only secure a precarious and burdensome prolongation of life, so long as the normal care due to the sick person in similar cases is not interrupted". Pope John Paul II, *The Gospel of Life: Evangelium Vitae* (1995), at para. 65, *citing* Congregation for the Doctrine of the Faith, *Declaration on Euthanasia Iura et Bona* (5 May 1980), at IV: AAS 72 (1980), at 551. However, and the crucial limitation in the cite is: *so long as normal care due to the sick person is not interrupted.* The distinction is clear, because of the limitation. Continuing,

*Evangelium Vitae* states, "To forego extraordinary or disproportionate means is not the equivalent of suicide or euthanasia; it rather expresses acceptance of the human condition in the face of death." *Id.* In other words, extraordinary care may be refused, but to refuse ordinary care is the equivalent of suicide or euthanasia. Therefore, the best interest standard contained in the majority should be limited to methods of extraordinary care. Safeguarding ordinary care as a basic right is the only standard consistent with the Kentucky law, as in *DeGrella* the powers of guardianship outlined above, or with the reading of the moral authorities cited by the majority.

Ordinary care is basic health care. Clearly delineating the provision of ordinary care from extraordinary care, earlier this year, Pope John Paul II stated in a Vatican Address, "I should like particularly to underline how the administration of water and food, even when provided by artificial means, always represents a *natural means* of preserving life, not a *medical act.*" Address of Pope John Paul II, To the Participants in the International Congress on "Life Sustaining Treatments and Vegetative State: Scientific Advances and Ethical Dillemas" at para. 5 (March 20, 2004) (emphasis in original). Like all other persons, the "sick person in a vegetative state, awaiting recovery or a natural end, still has the right to basic health care (nutrition, hydration, cleanliness, warmth, etc.), and to the prevention of complications related to the confinement in bed". *Id.* Concurrently, and with Pope John Paul II, an International Congress of health care providers and ethicists convened whose purpose was to discuss life-sustaining treatments and the vegetative state. *See* www.vegetativestate.org (last visited August 5, 2004). That congress resulted in a joint statement that accords with all

points of the Pope John Paul II address. However, the strongest point is the accord with the distinction made above between extraordinary and ordinary care. The papal address states:

> The obligation to provide the "normal care due to the sick in such cases" (Congregation for the Doctrine of the Faith, *Iura et Bona*, p. IV) includes, in fact, the use of nutrition and hydration (cf. Pontifical Council "Cor Unum", *Dans le Cadre*, 2, 4, 4; Pontifical council for Pastoral Assistance to Health Care Workers, *Charter of Health Care Workers*, n. 120). The evaluation of probabilities, founded on waning hopes for recovery when the vegetative state is prolonged beyond a year, cannot ethically justify the cessation or interruption of *minimal care* for the patient, including nutrition and hydration. Death by starvation or dehydration is, in fact, the only possible outcome as a result of their withdrawal. In this sense it ends up becoming, if done knowingly and willingly, true and proper euthanasia by omission.

Pope John Paul II Address, *supra*, at para 4 (emphasis in original).

Finally, lest there be any confusion over the stance espoused on euthanasia, *Evangelium Vitae, supra*, at para 66, says,

> The choice of euthanasia becomes more serious when it takes the form of a murder committed by others on a person who has in no way requested it and who has never consented to it. The height of arbitrariness and injustice is reached when certain people, such as physicians or legislators, arrogate to themselves the power to decide who ought to live and who ought to die. Once again we find ourselves before the temptation of Eden: to become like God who 'knows good and evil' (cf. Gen 3:5).

By adopting a standard that allows one person to determine to kill another by omitting food and water from them, we are sanctioning murder. It is made worse through adopting the standard by citing references that clearly state that basic care may never be willingly and knowingly removed. Therefore, we ought not allow our standard to permit the State, through a guardian ad litem or otherwise, deprive a Kentuckian of life.

The papal address also states that "it is not enough to reaffirm the general principle according to which *the value of a man's life cannot be made subordinate to any judgment of quality expressed by other men;* it is necessary to promote the *taking of positive actions* as a stand against pressures to withdraw hydration and nutrition as a way to put an end to the lives of these patients." *Id.* (emphasis added.)

The standard expressed in the majority opinion has failed to make an adequate distinction of ordinary care from extraordinary care.

The reference by the majority opinion that the afterlife is somehow better than impaired life is founded only on sincere religious faith. These religions generally assert that euthanasia and suicide are wrong because the end of life is in God's hands, not man's.

Not only does the majority ignore the above authorities, but also, it ignores the clear teaching of *DeGrella* against quality of life tests. Again, the "quality of life" ethic was rejected most recently in *Grubbs v. Barbourville Family Health Center, P.S.C.*:

> The argument that there is a kind of "quality of life" ethic is without any merit. This Court has rejected the quality of life philosophy in *DeGrella By and Through Parrent v. Elston*, Ky., 858 S.W.2d 698 (1993), which recognized that an individual has an inalienable right to

life as declared by the United States Declaration of Independence and protected by Section One of the Kentucky Constitution. Any quality of life ethic favors the life of the healthy over the infirm, the able-bodied over the disabled and the intelligent over the mentally challenged. If logically extended, it could produce a culture that condones the extermination of the weak by the strong or the more powerful.

The Nazi regime under Adolph Hitler is a not too distant reminder of this kind of eugenic approach. Unfortunately, such thoughts are not limited to foreign nations but can also be found in the writings of Justice Oliver Wendell Holmes in *Buck v. Bell*, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927), which approved of sterilization of the mentally incompetent. *Taylor [v. Kurapati*, 236 Mich.App. 315, 600 N.W.2d 670 (1999) ], calls to our attention the influence that Hitler's experiments with sterilization had on the American eugenics movement. Eugenics espouses the reproduction of the fit over the unfit and discourages the birth of the unfit. Bowman, *The Road to Eugenics*, 3 U. Chic. L. Sch. Roundtable 491 (1996).

120 S.W.3d at 692 (Wintersheimer concurring).

In conclusion, the majority standard has been built by ignoring the distinctions well seated within the authorities it used. Ordinary care, even for persons reliant on the State for such care, may not be subjected to a substituted judgment standard because it is the person's basic and fundamental right to receive such care. For these purposes, it fails to protect the basic rights of Kentuckians who rely on the State during these times when they are sick. Instead, the majority has opened the potential for atrocities similar to Bosnia where people relying on the State to speak on their behalf will be slowly killed by the removal of food and water. We have done so with the veneer of moral authority, but the core decision is full of error.

**D. The Proposed Standard is Not Objective**

The analysis of best interests by the majority opinion is logically contradictory by permitting "the surrogate to base the decision on an object of inquiry into the incompetent patient's best interest." There is no mention of standards or objective measurements of this so-called best interest test.

The philosophic and logical inconsistencies, and indeed the contradictory nature of the analysis, are immediately apparent by a simple reference to Webster's Collegiate Dictionary. "Objective" is defined as "viewing events, phenomena, ideas, etc. as external and apart from self-consciousness." "Objectivism" is defined as "stressing the objective reality, especially as distinguished from the purely subjective existence, of the phenomenal world, or the moral good or the like."

"Subjective" is defined as "not determined by universal reason or the universal condition of human experience and knowledge." "Subjectivism" is defined as "a theory which attaches great or supreme importance to the subjective elements in experience...the doctrine that individual feeling or apprehension is the ultimate criterion of what is the good and the right."

The focus of the majority opinion upon "the incompetent patient's best interests" is actually a subjective test. Simply calling it objective does not make it so.

The refusal of the majority opinion to recognize the dichotomy of the objective/subjective problem is further illustrated by the following: "We elaborate that in determining the best interests of the patient, 'the quality of life' is not considered

from the subjective point of view of the surrogate, but is an objective inquiry into 'the value that the continuation of life has for the patient.'' '

Once again, focusing on the subject and dealing with the 'quality of life' is obviously subjective. Calling it objective is of no avail.

## VI. Conclusion

It has been said that no person or court can substitute its judgment as to what is an acceptable quality of life for another person. *In re Westchester County Medical Center on Behalf of O'Connor,* 72 N.Y.2d 517, 534 N.Y.S.2d 886, 531 N.E.2d 607 (1988).

There is no question that significant safeguards for incompetent wards should be required of any process by which this State might seek to terminate life sustaining medical treatment of incompetent wards of the state. Most of the cases in the field of the so-called "right to die" jurisprudence deal with situations where a competent person or a formerly competent person who has become incapacitated has expressed some thought or wish about how he or she wanted to be treated in such a situation.

Even *DeGrella* requires that at least a clear and convincing standard of proof is the necessary standard for determining whether a healthcare surrogate may authorize the withdrawal or withholding of nutrition and hydration and that the substantive standard of proof is substantial and specific.

The right to life is a natural right which inheres automatically and can be asserted by all human beings. It does not rise through the exercise of any personal surrogate or governmental choice. It is bestowed on man by his Creator (cf. Declaration of Independence). The strict

scrutiny which is constitutionally required when a State seeks to terminate medical treatment for one of its wards is glaringly absent in KRS 311.631; the State and its agents must prove that a governmental interest in a patient's nontreatment overrides the individual's right to life. This burden was clearly not satisfied in the case of Matthew Woods and it could not be satisfied for any other similarly situated case involving a ward of the state.

KRS 311.631 establishes a potential abuse of patient's rights because how can it be in the patient's best interests to die? There is a great potential for serious conflict of interest for the State when it is paying the medical bill for the treatment of its ward. It is distressing to note that it was only 24 days after the heart attack of Woods that the Commonwealth filed in district court seeking approval to terminate medical treatment. The ward improved immediately after the trial to the point where his doctor rescinded his recommendation about discontinuing the ventilator. According to his physicians, Woods was never clinically brain dead, nor was he in any other legal sense, dead.

It was erroneous for the Court of Appeals to determine that KRS 311.631 authorized a guardian to exercise "substituted decision-making" for an incompetent person based on a subjective best interests test. It was error for the Court of Appeals to decide that the 1994 amendments to the Kentucky Living Will Directive Act, KRS 311.621 and 311.644, superseded the clear constitutional directives established by this Court in *DeGrella.*

The assertion by the majority that it is not approving euthanasia or assisted suicide is hollow. It would certainly appear that the majority has now taken the next step down the slippery slope away from the sanctity of all innocent human life and toward the secular value of meaningful life

introduced in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). It is a complete abandonment of *DeGrella,* which only eleven years ago specifically rejected the subjective "substituted judgment test." It must be recognized for what it is—a severe departure from *DeGrella.* Permitting anyone to decide when another should die on any basis other than clear and convincing evidence that the patient would chose to do so, is specifically condemned in *DeGrella* and now tragically approved in the majority opinion. The concern about the slippery slopes articulated in both the majority and dissenting opinions in *DeGrella* is obviously upon us. In any society which claims to have even the veneer of civilization such behavior is totally unacceptable. We cannot close our eyes to the destruction of innocent life at any stage of development or any impaired condition of existence. To do so degrades our own culture and all of us. The English poet John Donne (1570–1631) expressed it well when he wrote:

> Any man's death diminishes me, because I am involved in mankind; and therefore, never send to know for whom the bell tolls, it tolls for thee.

Today, this case involves a mentally deficient ward of the State. Who knows whom it will involve in the future? Only by making the mistaken assumption that it could never happen, the power of the State has been unleashed to kill its own citizens.

STUMBO, J., joins this dissent as to Parts I through IV.