RENDERED: AUGUST 14, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0510-DG

LEXINGTON ALZHEIMER'S INVESTORS,　　　　　　　　　　APPELLANTS
LLC D/B/A THE LANTERN AT
MORNING POINTE ALZHEIMER'S
CENTER OF EXCELLENCE; BROOKE
GRIFFITH, IN HER CAPACITY AS
EXECUTIVE DIRECTOR OF THE
LANTERN AT MORNING POINTE OF
LEXINGTON; GREG A. VITAL;
INDEPENDENT HEALTHCARE
PROPERTIES, LLC; AND J. FRANKLIN
FARROW


|  | ON REVIEW FROM COURT OF APPEALS |
| V. | NO. 2022-CA-0965 |
|  | FAYETTE CIRCUIT COURT NO. 21-CI-02030 |


SANDRA NORRIS, AS ADMINISTRATRIX　　　　　　　　　　APPELLEE
OF THE ESTATE OF RAYFORD
CHARLES NORRIS


**OPINION OF THE COURT BY CHIEF JUSTICE LAMBERT**

**<u>AFFIRMING</u>**

Lexington Alzheimer's Investors, LLC d/b/a The Lantern at Morning

Pointe Alzheimer's Center of Excellence, Lexington; Brooke Griffith, in her

capacity as Executive Director of The Lantern at Morning Pointe of Lexington;

Independent Healthcare Properties, LLC; Greg A. Vital; and J. Franklin Farrow

(collectively, "The Lantern") appeal from a decision of the Court of Appeals

which upheld a Fayette Circuit Court order denying The Lantern's motion to compel arbitration.

This Court granted discretionary review to address, as a matter of first impression, whether an incapacitated person's spouse may enter into a binding arbitration agreement on behalf of the incapacitated spouse for admittance into a personal care facility because doing so constitutes a "health care decision" as defined by Kentucky's Living Will Directive Act.[1]  After review, we hold that entering into an arbitration agreement under these circumstances is not a health care decision as contemplated in KRS 311.631 and as defined in KRS 311.621 and affirm the Court of Appeals.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Sandra Norris brought the underlying claim in both her individual capacity and as the administratrix of her late husband Rayford Norris' estate. On September 23, 2019, the Chancery Court for Clay County, Tennessee entered an order appointing Sandra as Rayford's conservator, as he had been diagnosed with Alzheimer's disease.  Sandra later sought to have Rayford admitted to The Lantern's facilities in Lexington, Kentucky.  The Lantern is a private pay personal care facility.  As a condition of accepting Rayford as a patient, The Lantern required Sandra to sign a four page "Mandatory Arbitration Agreement" that stated, *inter alia*:

> ***This agreement is <u>MANDATORY</u> and <u>IS REQUIRED</u> for the resident to reside in or receive care at the Community.  All new residents and/or their legal representatives are required***

---

[1] Kentucky Revised Statutes (KRS) 311.621 through KRS 311.643.

> ***to read, agree, and sign this Mandatory Arbitration Agreement. <u>You may choose to reside at another facility if you do not wish to sign</u>. By signing this Agreement, the parties are mutually waiving their right to a trial in court and a trial by jury.***

The signature block for the "Signature of Resident or Legal Representative of Resident" requested that the signee "designate the capacity in which you are signing; i.e., Self, Power of Attorney, guardian, Attorney-in-Fact, etc." Sandra signed the arbitration agreement, but she did not designate the capacity in which she did so. Rayford was admitted to The Lantern three days later and remained in their care until March 6, 2020. Sandra alleges that while Rayford was a patient at The Lantern he suffered multiple falls, weight loss, and a stage three bedsore on his coccyx that was necrotic and infected with E. Coli. Rayford passed away in August 2020, approximately five months after leaving The Lantern.

Sandra filed the underlying lawsuit on July 8, 2021, which asserted claims for negligence, medical negligence, corporate negligence and corporate manipulation of funds, wrongful death, and loss of consortium. After each of the respective defendants filed an answer, The Lantern filed a motion to stay Sandra's claims for wrongful death and loss of consortium and to compel arbitration of the remaining claims. It asserted that the arbitration agreement was valid and enforceable because the Tennessee Order granted Sandra the authority to enter into the arbitration agreement on Rayford's behalf as his conservator. It further asserted that, assuming *arguendo* that the Tennessee

3

Order did not confer that authority, Kentucky's Living Will Directive Act did, as it provides:

> (1) If an adult patient whose physician has determined that he or she does not have decisional capacity has not executed an advance directive, or to the extent the advance directive does not address a decision that must be made, any one (1) of the following responsible parties, in the following order of priority if no individual in a prior class is reasonably available, willing, and competent to act, shall be authorized to make health care decisions on behalf of the patient:
>
> . . .
>
> (c) The spouse of the patient[.]

KRS 311.631(1)(c). The Act defines a "health care decision" as "consenting to, or withdrawing consent for, any medical procedure, treatment, or intervention." KRS 311.621(8). Citing *Jackson v. Legacy Health Servs., Inc.*, 640 S.W.3d 728 (Ky. 2022), and *Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581 (Ky. 2012), The Lantern reasoned that because signing the arbitration agreement was a necessary condition for Rayford's admission to its facilities, signing the agreement was a "heath care decision." The Lantern also preemptively argued that the arbitration agreement was not unenforceable on the grounds of unconscionability.

In Sandra's response, she highlighted that the Tennessee Order had not been registered in a Kentucky court when she signed the arbitration agreement, and it consequently had no legal effect within the Commonwealth. KRS 387.842(1)("To confirm transfer of a. . . conservatorship transferred to this state. . . [the] conservator shall petition the court in this state to accept the guardianship or conservatorship."); KRS 387.848(1) ("Upon registration of a

4

guardianship or protective order from another state, the guardian or conservator may exercise in this state all powers authorized in the order of appointment[.]"). She asserted that she accordingly lacked the authority to bind Rayford to the Kentucky arbitration agreement pursuant to the Tennessee Order, rendering it unenforceable. She further argued that the arbitration agreement was unconscionable.

In The Lantern's reply, it agreed that the Tennessee Order had not been registered in Kentucky and abandoned its argument in relation to it. Notwithstanding, it again asserted that the Living Will Directive Act granted her the authority as Rayford's spouse to sign the arbitration agreement on his behalf.

During the hearing that followed, the parties asserted the same arguments made in their respective filings. Sandra further argued that signing the arbitration agreement was not a health care decision under the Living Will Directive Act. She reasoned that "consenting to, or withdrawing consent for, any medical procedure, treatment, or intervention[,]" did not include signing an arbitration agreement. Moreover, she argued, there was no Kentucky case law that held signing an arbitration agreement is a health care decision under KRS 311.631. The circuit court agreed with Sandra and denied The Lantern's motion to compel arbitration. It found that "signing a mandatory arbitration agreement in this context did not constitute a healthcare decision, and, therefore, [Sandra] did not have authority to enter into a mandatory arbitration

5

agreement on [Rayford's] behalf[.]" The court "made no ruling related to whether the agreement was unconscionable."

The Lantern subsequently appealed the circuit court's ruling, and the Court of Appeals affirmed. *Lexington Alzheimer's Inv'rs, LLC v. Norris*, 2022-CA-0965-MR, 2023 WL 6774023 (Ky. App. Oct. 13, 2023). The Court of Appeals acknowledged that both *Ping* and *LP Louisville E., LLC v. Patton*, 651 S.W.3d 759 (Ky. 2020) provide that signing an arbitration agreement can be considered a health care decision when entering said agreement is a mandatory condition of admission into a facility. *Norris*, 2023 WL 6774023 at *1. Nevertheless, it held that *Ping* and *Patton* are distinguishable from the case at bar because both cases involved a power of attorney, and this case does not. *Id.* at *2. It reasoned that the Living Will Directive Act does not grant a broad array of powers and expressly limits "health care decisions" to "consenting to, or withdrawing consent for, any medical procedure, treatment, or intervention." *Id.* (quoting KRS 311.621(8)). The Court of Appeals held that this narrow definition

> does not encompass the ability to enter into an arbitration agreement, even if the agreement was required to be admitted into a nursing home facility. . . A power of attorney granting general health care authority may encompass the ability to enter into an arbitration agreement; however, the health care decisions granted by the statutes discussed above do not include this power.

*Id.* The Lantern appealed the Court of Appeals ruling, and this Court granted its request for discretionary review.

6

## II.  ANALYSIS

### A. Validity of the Arbitration Agreement

Before this Court, The Lantern renews its argument that KRS 311.631(1)(c) granted Sandra the authority to sign its mandatory arbitration agreement on Rayford's behalf.  It relies upon this Court's seminal decisions in *Ping, Patton,* and *Jackson* to support its argument that, because signing the arbitration agreement was a mandatory condition for Rayford's admission into its facilities, doing so constituted a health care decision as defined by KRS 311.621(8).

Sandra asserts three arguments in response: the definition of health care decision housed within KRS 311.621(8) does not include the signing of a mandatory arbitration agreement in order to effectuate admission into a personal care facility; The Lantern has not proven or alleged the factual elements necessary for KRS 311.631(1) to apply; and the Living Will Directive Act applies solely to end-of-life decision making and therefore does not apply to Sandra's decision to admit Rayford into a personal care facility.

As this dispute concerns the enforcement of an alleged agreement to arbitrate, it may implicate both the Kentucky Uniform Arbitration Act (KUAA), KRS 417.045 – 417.240, and the Federal Arbitration Act (FAA), 9 U.S.C.A.[2] § 1 - § 16.  Both Acts "evince a legislative policy favoring arbitration agreements, or at least shielding them from disfavor."  *Ping,* 376 S.W.3d at 588.  The objective of both Acts "is to ensure that arbitration agreements are enforced no less

---

[2] United States Code Annotated.

7

rigorously than other contracts and according to the same standards and principles." *Id.* at 589.

"Because arbitration is fundamentally a matter of contract, an arbitration agreement is treated as all other contracts and if the agreement is valid, it will be enforced." *Patton*, 651 S.W.3d at 765 (internal citation omitted). "[A] party seeking to compel arbitration has the initial burden of establishing the existence of a valid agreement to arbitrate." *Ping*, 376 S.W.3d at 590. If the proponent presents *prima facie* evidence that a valid agreement exists, "the burden shifts to the party seeking to avoid the agreement to rebut the presumption." *Patton*, 651 S.W.3d at 765. This Court reviews a trial court's application of the foregoing principles *de novo*, affording no deference to its conclusions. *Ping*, 376 S.W.3d at 590.[3]

1) ***The Uniform Power of Attorney Act, Guardianship and Conservatorship for Disabled Persons, and the Living Will Directive Act***

As it will provide useful context, we first provide a brief comparison of the Uniform Power of Attorney Act, KRS 457.010 – 457.460; Guardianship and Conservatorship for Disabled Persons, KRS 387.500 – 387.800; and the Living Will Directive Act, KRS 311.621 – 311.643.

The Uniform Power of Attorney Act is the statutory scheme that governs the creation, subject matter, and termination of a power of attorney. A power of attorney is a writing or other record by which a principal authorizes an agent

---

[3] The Lantern does not dispute any of the circuit court's findings of fact, which would otherwise be reviewed for clear error. *Id.*

to act in his or her place. KRS 457.020(7). A power of attorney may only be executed by a principal with decisional capacity, i.e., principal decides what acts the agent is permitted to perform on his or her behalf. And, unless the power of attorney provides otherwise, the agent's authority to act in the principal's stead will continue if the principal becomes incapacitated. KRS 457.040.

Typically, a power of attorney covers certain matters related to a principal's property or finances, KRS 457.410, but a principal can choose to include a limited number of other matters, including the power "to make health-care decisions including but not limited to health-care decisions outlined in [the Kentucky Living Will Directive Act.]" KRS 457.030(2). A power of attorney becomes effective when executed by a principal, unless the power of attorney provides otherwise, KRS 457.090(1); KRS 457.050, and terminates upon any of the occurrences stated in KRS 457.100(1) such as the death of the principal or the court appointment of a conservator, limited conservator, guardian, or limited guardian of the principal's estate unless the court orders that the power of attorney is to remain in effect.

In contrast to a power of attorney, guardianships and conservatorships are meant for individuals who require assistance managing their financial resources and/or personal affairs but lack the capacity to determine for themselves how much of their autonomy should be ceded. They may only be

put in place for an adult[4] who is either disabled, KRS 387.510(8)(a)-(b), or partially disabled, KRS 387.510(9), and therefore lacks the ability to manage either all or some of his or her personal affairs and/or financial resources. A conservator is a court-appointed individual, agency, or corporation that manages the financial resources of a disabled ward, KRS 387.510(1), while a limited conservator assists a partially disabled ward in managing his or her financial resources. KRS 387.510(2). Similarly, a guardian is a court-appointed individual, agency, or corporation that manages the personal affairs of a disabled ward, KRS 387.510(3), while a limited guardian assists a partially disabled ward with his or her personal affairs. KRS 387.510(4). A ward's personal affairs may include, but are not limited to, "health care, food, shelter, clothing, [and] personal hygiene." KRS 387.510(17).

There are numerous steps that must be taken before a district court may hold proceedings to appoint a guardian or conservator, *see* KRS 387.520 – KRS 387.560, after which the court holds an initial hearing to determine whether the potential ward is disabled or partially disabled; a determination that is usually made by a jury. KRS 387.570. If the individual is found to be disabled or partially disabled, the court will then determine, *inter alia*: the type of guardian, conservator, or both to be appointed; the individual to be appointed as guardian, conservator, limited guardian, or limited conservator; and the duration of the guardianship and/or conservatorship. KRS 387.580. Unless

---

[4] Guardianships and conservatorships for minors are provided for under KRS 387.010, *et seq.*

10

otherwise modified by court order, the statutory powers of a guardian over a disabled ward include "[giving] any necessary consent or approval to enable the ward to receive medical or other professional care, counsel, treatment[,] or service[,]"[5] and "[t]o act with respect to the ward in manner which limits the deprivation of civil rights. . . only to the extent necessary to provide needed care and services to him [or her.]"  KRS 387.660(3)-(4).

The Living Will Directive Act allows an adult with decisional capacity to execute a living will or other advance directive that designates a surrogate to make health care decisions on his or her behalf in the event that the grantor becomes incapacitated.[6]  KRS 311.623; KRS 311.625.  A living will is directed toward end-of-life treatment such as the withholding or withdrawal of life-prolonging treatment; the withholding or withdrawal of artificially provided nutrition or hydration; and whether the grantor wishes to be an organ donor upon his or her demise.  KRS 311.623(1).  A surrogate designated pursuant to a living will "may make health care decisions for the grantor which the grantor could make individually if he or she had decisional capacity, provided all the decisions shall be made in accordance with the [grantor's desires] as indicated in the [living will]."  KRS 311.629(1).

---

[5] This authority does not include the authority to consent to an abortion, sterilization, psychosurgery, removal of a bodily organ, or amputation of a limb on behalf of the ward unless the procedure is first approved by a court order or is necessary in an emergency to preserve the life of or to prevent serious impairment to the ward's physical health.  KRS 387.660(3).

[6] The Act also provides for the execution of a voluntary Kentucky medical order for scope of treatment (MOST) form, which is trumped by a living will in the event of a conflict between the two.  KRS 311.6225.

The statute in the Living Will Directive Act at issue in the case now before us, KRS 311.631, governs situations wherein a medical decision must be made for an adult patient that lacks decisional capacity and "has *not* executed an advance directive[.]"[7]  KRS 311.631(1) (emphasis added).  If that eventuality occurs, the statute authorizes

> any one (1) of the following responsible parties, in the following order of priority. . . to make health care decisions on behalf of the patient:
>
> (a) The judicially appointed guardian of the patient, if the guardian has been appointed and if medical decisions are within the scope of the guardianship;
>
> (b) The attorney-in-fact named in a durable power of attorney, if the durable power of attorney specifically includes authority for health care decisions;
>
> (c) The spouse of the patient;
>
> (d) An adult child of the patient. . .;
>
> (e) The parents of the patient;
>
> (f) The nearest living relative of the patient. . .;
>
> (g) An adult friend of the patient[.]

KRS 311.631(1)(a)-(g).  Unlike the statutes governing a power of attorney or a guardianship, the Living Will Directive Act explicitly defines a "health care decision" as "consenting to, or withdrawing consent for, any medical procedure,

---

[7] KRS 311.621(2) defines "advance directive" as "a living will directive made in accordance with KRS 311.621 to 311.643, a living will or designation of health care surrogate executed prior to July 15, 1994, and any other document that provides directions relative to health care to be provided to the person executing the document."

treatment, or intervention[.]" *Compare* KRS 311.621(8) *with* KRS 457.020; KRS 387.510.

To summarize: when a power of attorney is executed, the principal knowingly and voluntary grants authority to an agent to act on their behalf; when a guardianship and/or a conservatorship is ordered, a ward's autonomy over his or her personal affairs and/or finances is granted to another individual or entity pursuant to a court order; and when a living will is executed the grantor knowingly and voluntarily designates a surrogate to make certain health care decisions on his or her behalf in the event that he or she becomes incapacitated. And, when an incapacitated person does not have a living will or other advance directive, KRS 311.631 imbues certain individuals with the authority to "[consent] to, or [withdraw] consent for, any medical procedure, treatment, or intervention" on that person's behalf. In other words, neither the patient nor a court authorizes that individual to act on the incapacitated person's behalf. Rather, his or her authority to act is solely derived from KRS 311.631.

With this background established we now address the pertinent, albeit inapplicable, case law relied upon by The Lantern.

## 2) *Ping, Patton,* and *Jackson*

In *Ping,* Alma Duncan, a competent adult, executed a durable power of attorney and named her daughter, Donna Ping, as her attorney-in-fact. 376 S.W.3d at 586-87. The power of attorney authorized Ping "to do and perform any, all, and every act and thing *whatsoever requisite and necessary* to be

13

done, to and for all intents and purposes, as I might or could do if personally present[.]" *Id.* at 586 (emphasis added). Concerning Duncan's medical care, it authorized Ping "[t]o make any and all decisions of whatever kind, nature[,] or type regarding [Duncan's] medical care. . . and [t]o generally do any and every further act and thing of whatever kind, nature, or type *required to be done* on [Duncan's] behalf." *Id.* at 587 (emphasis added).

Duncan suffered a stroke after executing the power of attorney, and Ping admitted her to a long-term care facility. *Id.* As part of the admissions process Ping signed a voluntary arbitration agreement as Duncan's "authorized representative" and the agreement reflected Ping was Duncan's daughter and attorney-in-fact. *Id.* Duncan died approximately six months later, and Ping filed a suit for negligence and wrongful death against the facility on behalf of her estate. *Id.* at 588. The facility filed a motion to dismiss Ping's complaint or to stay it pending arbitration, which the trial court denied. *Id.* at 586. The Court of Appeals reversed based on its holding that Ping had the authority to bind Duncan to a voluntary arbitration agreement pursuant to the power of attorney. *Id.* at 588. This Court reversed the Court of Appeals and reinstated the trial court's ruling. *Id.* at 588-94.

The *Ping* Court reasoned that the scope of authority granted under a power of attorney is "left to the principal to declare. . . [and] even a 'comprehensive' durable power would not be understood as implicitly authorizing all the decisions a guardian might make on behalf of a ward." *Id.* at 592. Accordingly, as Duncan's power of attorney only granted Ping the

14

authority to do "every act and thing whatsoever *requisite and necessary* to be done" and "every further act and thing of whatever kind, nature, or type *required* to be done" on her behalf, and as the voluntary arbitration agreement was not requisite or necessary for Duncan's admission into the facility, Ping did not have the authority to bind Duncan to it as her attorney-in-fact. *Id.* at 592-94.

This Court went on to state as a general rule that "where an agreement to arbitrate is presented to the patient as a condition of admission to the nursing home. . . the authority incident to a health-care durable power of attorney includes the authority to enter such an agreement[,]" but when "the arbitration agreement is not a condition of admission to the nursing home, but is an optional, collateral agreement. . . [the] authority to choose arbitration is not within the purview of a health-care agency, since in that circumstance agreeing to arbitrate is not a 'health care' decision." *Id.* at 593 (internal citations omitted).

Nine years after *Ping, Patton* presented the exact factual circumstances *Ping* contemplated for an attorney-in-fact to have the authority to bind a principal to an arbitration agreement as a health care decision. In *Patton,* Tommy Patton executed a durable power of attorney that designated his son, Kenneth Patton, as his attorney-in-fact. 651 S.W.3d at 763. The document stated that Kenneth "shall have all powers as are *necessary* or desirable to provide for [Tommy's] support, maintenance, health, emergencies, and urgent necessities." *Id.* (emphasis added). Kenneth had Tommy admitted into a long-

15

term care facility by signing a mandatory arbitration agreement as Tommy's authorized representative. *Id.* at 762. Tommy died a few weeks later, and Kenneth filed suit against the facility for negligence and wrongful death both in his individual capacity and on behalf of Tommy's estate. *Id.* at 763. The facility filed a motion to dismiss Kenneth's claims or compel arbitration, which the trial court denied, and the Court of Appeals thereafter affirmed. *Id.* at 763-64.

The *Patton* Court reversed and held, in accordance with *Ping*, "that when an agreement to arbitrate is presented as a condition of admission to a nursing home, unless otherwise agreed, a power of attorney expressing general authority to make necessary health care decisions includes the incidental or reasonably necessary authority to enter that agreement." *Id.* at 770. Accordingly, Kenneth had the authority to sign the mandatory arbitration agreement to obtain Tommy's admittance into the facility, and the arbitration agreement was enforceable against his estate. *Id.*

Finally, *Jackson* applied the principles established in *Ping* and *Patton* to a set of facts involving a guardianship rather than a power of attorney. In *Jackson*, a district court declared Christine Jackson wholly disabled and appointed her son Christopher Jackson as her guardian but did not specify the extent of Christopher's authority. 640 S.W.3d at 730. Christopher had Christine admitted to a long-term care facility and signed a voluntary arbitration agreement as part of her admission. *Id.* After Christine died Christopher filed a negligence and wrongful death suit against the facility on

16

behalf of Christine's estate, and the facility filed a motion to compel arbitration. *Id.* The trial court denied the motion, and the Court of Appeals reversed. *Id.*

The *Jackson* Court reversed the Court of Appeals and reinstated the trial court's order denying the motion to compel arbitration. *Id.* The Court noted, pursuant to KRS 387.660, that a guardian must act "in a manner which limits the deprivation of civil rights. . . only to the extent necessary to provide needed care and services to [the ward,]" and that nothing in the applicable statutes suggested that "when the ward is deprived of the ability to enter into contracts on their own behalf by the appointment of a guardian, the authority to enter any and all contractual relationships on the ward's behalf automatically vests to the guardian." *Id.* at 733. Rather, the legislature permits a guardian to surrender the civil rights of a ward only to the extent *necessary* to provide the ward with needed services and care. *Id.* at 734. Consequently, because signing the arbitration agreement was not a necessary condition for Christine to be admitted to the facility, Christopher did not have the authority to sign it on her behalf as her guardian. *Id.* at 735. The Court noted, similar to the *Ping* Court, that if the arbitration had been a mandatory condition of Christine's admission to the facility, then Christopher "would have had the authority to bind her to the agreement." *Id.*

### 3) *KRS 311.631 did not authorize Sandra to sign the mandatory arbitration agreement on Rayford's behalf as his spouse.*

In contrast to the foregoing precedents, Rayford did not execute a power of attorney naming Sandra as his agent and Sandra was not appointed as his

17

guardian by a Kentucky court. Moreover, the Tennessee conservatorship order was not enforceable in Kentucky when Sandra signed the arbitration agreement, and Rayford had not executed a living will or another advance directive that designated Sandra to act as his surrogate. Consequently, the sole source of any authority Sandra had to bind him to the mandatory arbitration agreement had to come from KRS 311.631(1)(c) by virtue of her status as his spouse.

But KRS 311.631 does not grant a spouse "all powers as are necessary to provide for [the patient's] support, maintenance, [or] health" like the power of attorney in *Patton.* 651 S.W.3d at 763. Nor does it allow a spouse to "give any necessary consent or approval to enable the [patient] to receive medical. . . care," or to act "in a manner which limits the deprivation of civil rights. . . only to the extent necessary to provide needed care and services to [the patient]" as the guardianship statutes do. KRS 387.660(3),(4). Rather, our legislature limited the decisions that may be made under KRS 311.631(1)(c) to "health care decisions on behalf of the patient[,]" and further limited those health care decisions to "consenting to, or withdrawing consent for, any medical procedure, treatment, or intervention[.]" KRS 311.621(8). Signing an arbitration agreement, mandatory or not, is not a medical procedure, it is not a medical treatment, and it is not a medical intervention. We accordingly hold that signing an arbitration agreement cannot constitute a health care decision when the agreement is signed by an individual acting solely as the incapacitated patient's spouse pursuant to KRS 311.631.

18

Moreover, we agree with Sandra's assertion that, even if signing an arbitration agreement could be considered a health care decision under these circumstances, it does not appear that The Lantern has presented or alleged sufficient evidence for KRS 311.631 to be invoked. As discussed, the statute provides that certain individuals may make health care decisions on behalf of "an adult patient *whose physician has determined* that he or she does not have decisional capacity[,]" and who has not executed an advance directive. KRS 311.631(1). Elsewhere the statute mandates that "[i]n any case in which a health care decision is made under this section, the decision shall be noted in writing in the patient's medical records." KRS 311.631(2). Upon this Court's review of the record, there is nothing apart from the unregistered Tennessee Order that would indicate Rayford's physician determined he lacked decisional capacity. And, at any rate, there is no indication whatsoever that, if signing the arbitration agreement was indeed a health care decision, that decision was noted in writing in Rayford's medical records.

Given our holding herein, we leave for another day Sandra's assertion under *Woods v. Commonwealth,* 142 S.W.3d 24 (Ky. 2004), that KRS 311.631 applies solely to end-of-life decision making and was therefore not applicable to Sandra's decision to admit Rayford into a personal care facility in the first instance.

## B. Our decision does not run afoul of *Kindred Nursing Centers Limited Partnership v. Clark*, 581 U.S. 246 (2017).

The Lantern next asserts that the manner in which the circuit court, the Court of Appeals, and now this Court have interpreted KRS 311.631 is violative

of the United States Supreme Court's holding in *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 581 U.S. 246 (2017).  The Lantern failed to present this argument to the circuit court and instead raised it for the first time before the Court of Appeals, which did not address it.  Nevertheless, even if this Court could conclude the argument was properly preserved, it is meritless.

In *Clark*, the United States Supreme Court reversed in part this Court's ruling in *Extendicare Homes, Inc. v. Whisman*, 478 S.W.3d 306 (Ky. 2015), *judgment rev'd in part, vacated in part sub nom. Kindred Nursing Ctrs Ltd. P'ship v. Clark*, 581 U.S. 246 (2017).  581 U.S. at 248.  *Whisman* concerned, in relevant part, a power of attorney that granted the agent "'full power. . . to transact, handle, and dispose of all matters affecting [the principal] and/or [the principal's] estate in any possible way,' including the power to 'draw, make, and sign in [the principal's] name any and all. . . contracts, deeds, or assignments.'"  *Id.* at 249.  The *Whisman* Court held that the "extremely broad delegation of authority" in the power of attorney did not authorize the agent to enter an arbitration agreement on the principal's behalf because the power of attorney did not explicitly state that the agent had the authority to enter arbitration agreements.  *Id.* at 250.  This became known as the "clear-statement rule."

The United States Supreme Court's opinion in *Clark* invalidated the clear-statement rule on the grounds that it violated the FAA.  *Id.* at 251-55.  The Court expounded that the FAA makes arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in

20

equity for the revocation of any contract" in order to ensure that arbitration agreements are treated equally amongst other types of contracts. *Id.* at 251 (quoting 9 U.S.C. § 2). Consequently, while a court "may invalidate an arbitration agreement based on 'generally applicable contract defenses' like fraud or unconscionability" it may not do so based on "legal rules that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" *Id.* (quoting *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). Thus, the FAA "preempts any state rule discriminating on its face against arbitration[.]" *Id.*

The *Clark* Court concluded the *Whisman* Court's clear-statement rule failed to put arbitration agreements on equal footing with other contracts because it "specifically impeded the ability of attorneys-in-fact to enter into arbitration agreements[,]" and thereby "flouted the FAA's command to place those agreements on equal footing with other contracts." *Id.* at 255-56.

Our holding today does not violate *Clark*. An agent may only bind a principal to a contract if the agent has the authority to do so. *See, e.g., Ping*, 376 S.W.3d at 596 (emphasis added) (quoting *Restatement (Third) of Agency* § 6.01 (2006)) ("[W]hen an agent *acting with actual or apparent authority* makes a contract on behalf of a disclosed principal, (1) the principal and the third party are parties to the contract[.]"). We hold that the arbitration agreement at issue herein was invalid because Sandra lacked the authority to enter it on Rayford's behalf. The only possible source of authority she had to do so was the authority granted to her under KRS 311.631(1)(c) based on her status as his

21

wife. And that statute only permitted her to consent to or withdraw consent for a medical procedure, treatment, or intervention. KRS 311.621(8). It did not authorize her to enter into an arbitration agreement on Rayford's behalf. Thus, the arbitration agreement is invalid based on "a generally applicable contract defense"—that the agent acted without requisite authority to bind the principal to it—and not a rule that discriminates against arbitration on its face. *Clark*, 581 U.S. at 251 (quoting *Concepcion*, 563 U.S. at 339).

## C. The Parties' Remaining Arguments

The Lantern further asserts that Sandra should be equitably estopped from challenging the arbitration agreement's enforceability. The Lantern failed to raise this argument before the circuit court, and we decline to address it. *See* CR[8] 46. Sandra has additionally asserted that the arbitration agreement was unenforceable on the grounds of unconscionability. As we hold that the arbitration agreement was not valid due to her lack of authority to enter it on Rayford's behalf, and because the trial court did not issue a ruling on the issue, we decline to address whether the arbitration agreement was also unconscionable.

## III. CONCLUSION

Based on the foregoing, we affirm the Court of Appeals' ruling to uphold the Fayette Circuit Court's denial of The Lantern's motion to compel

---

[8] Kentucky Rule of Civil Procedure.

arbitration. We hereby remand this case to Fayette Circuit Court for further proceedings.

Lambert, C.J.; Bisig, Conley, Keller, Nickell, and Thompson, JJ., sitting. All concur. Goodwine, J., not sitting.

COUNSEL FOR APPELLANTS:

Paul A. Dzenitis
Tomsen F. Leonard
Emily W. Newman
Dzenitis Newman, PLLC


COUNSEL FOR APPELLEE:

Tyler S. Stewart
Gardner Law, PLLC